[No. C000634. Third Dist. Aug. 18, 1987.]

THE PEOPLE ex rel. CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, Plaintiff and Respondent, v. ROBERT R. BARRY et al., Defendants and Appellants.

COUNSEL

Pettitt & Martin, Walter F. Pettitt and Patricia A. Meagher for Defendants and Appellants.

John K. Van de Kamp, Attorney General, R. H. Connett, Assistant Attorney General, Kathleen E. Gnekow, Edna Walz and Ellen M. Peter, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SIMS, J.—Water Code section 13305,[1] a portion of the Porter-Cologne Water Quality Control Act (§ 13000 et seq.), provides a mechanism under which a California Regional Water Quality Control Board, Central Valley Region (regional board) may abate water pollution emanating from nonoperating industrial or business locations. Pursuant to section 13305, the regional board obtained an order from the Plumas County Superior Court commanding defendants Robert R. Barry and Calicopia Corporation (Barry) to allow the regional board and its contractor access to Barry's property known as the Walker Mine for the purpose of abating a source of water pollution continuously existing since the end of World War II.

Barry appeals, contending: (1) the regional board sought the order prematurely because it relied on its own resolutions directing cleanup of the mine (No. 86-057) and approving a negative declaration (No. 86-056) while Barry's petition for review of these resolutions was pending before the State Water Resources Control Board (state board); (2) the regional board lacks authority to clean up the mine under section 13304; (3) the regional board lacks authority to clean up the mine under section 13305 because it failed to make necessary findings and because no evidence would have supported the findings had they been made; (4) the regional board's cleanup resolution is void because it specifies the manner of compliance in violation of section 13360; and (5) the regional board, having filed this action seeking an injunction under section 13304, could not seek relief under section 13305. We previously issued a writ of supersedeas staying the regional board's order.

We conclude the regional board's orders were final because the state board properly declined to review them; the regional board made adequate findings under section 13305 which are supported by substantial evidence; section 13360 does not apply to self-help actions by regional boards; and the

---

[1] Statutory references are to the Water Code unless otherwise indicated.

regional board was not precluded from proceeding under section 13305. We therefore do not reach Barry's contentions under section 13304. We affirm the order of the trial court. We shall also vacate our writ of supersedeas.

FACTUAL AND PROCEDURAL BACKGROUND

Walker Mine is an inactive copper mine located in Plumas County about 20 miles east of Quincy. Since the mid-1940's, Walker Mine has discharged acid mine drainage (polluted water) into Dollie Creek and Little Grizzly Creek which are upper tributaries of the Feather River. Above the mine these creeks are of excellent water quality and contain abundant levels of aquatic insects and fish. However, below the mine their condition is such that aquatic organisms cannot survive. Acid drainage from the mine renders 10 miles of watercourse uninhabitable by aquatic organisms.

Walker Mine was discovered in 1904 and actively mined from 1916 to 1932, and from 1935 to 1941. Barry obtained the mine in 1948 and recorded a deed in the names of himself and Calicopia Corporation, a family-owned New York State corporation.

Since 1958, the regional board has issued to Barry numerous waste discharge requirements, cleanup and abatement orders, and cease and desist orders, all requiring him to abate the pollution of the state's waters. These orders include the following: On April 24, 1958, the regional board issued waste discharge requirements.

On April 8, 1959, the regional board issued a cleanup and abatement order.

On July 18, 1963, the regional board issued a cease and desist order.

On October 26, 1970, the regional board issued an abatement order.

On September 8, 1971, the regional board issued a cleanup and abatement order.

On May 23, 1975, the regional board issued waste discharge requirements.

On May 30, 1980, the regional board issued waste discharge requirements and a cleanup and abatement order.

On January 25, 1985, the regional board issued waste discharge requirements.

Each of these orders has failed to eliminate the pollution emanating from Walker Mine.

Over the years, Barry has undertaken several steps aimed at abating the acid discharge from the mine. However, each of Barry's measures has proved unsuccessful.

In 1970, after notice to Barry and a hearing, the regional board took the first step toward a government-conducted cleanup pursuant to section 13305.[2] (See § 13305, subd. (a).) Under section 13305 the regional board by

---

[2] Section 13305 provides: "(a) Upon determining that a condition of pollution or nuisance exists which has resulted from a nonoperating industrial or business location within its region, a regional board may cause notice of such condition to be posted upon the property in question. The notice shall state that such condition constitutes either a condition of pollution or nuisance which must be abated by correction of such condition, otherwise it will be corrected by the city, county, other public agency, or regional board at the property owner's expense. Such notice shall further state that all property owners having any objections to the proposed correction of such condition may attend a hearing to be held by the board at a time not less than 10 days from the posting of the notice. [¶] (b) Notice of the hearing prescribed in this section shall be given in the county where the property is located pursuant to Section 6061 of the Government Code. [¶] (c) In addition to posting and publication, notice as required in this section shall be mailed to the property owners as their names and addresses appear from the last equalized assessment roll. [¶] (d) At the time stated in the notices, the board shall hear and consider all objections or protests, if any, to the proposed correction of the condition, and may continue the hearing from time to time. [¶] (e) After final action is taken by the board on the disposition of any protests or objections, or in case no protests or objections are received, the board shall request the city, county, or other public agency in which the conditions of pollution or the nuisance exists to abate it. In the event that such city, county, or other public agency does not abate such condition within a reasonable time the board shall cause the condition to be abated. It may proceed by force account, contract or other agreement or any other method deemed most expedient by the board, and shall apply to the state board for the necessary funds. [¶] (f) The owner of the property on which the condition exists, or is created, is liable for all reasonable costs incurred by the board or any city, county, or public agency in abating the condition. The amount of the cost for abating the condition upon the property in question shall constitute a lien upon the property so posted upon the recordation of a notice of lien, particularly describing the property on which the condition was abated and the amount of such lien, and naming the owner of record of such property, in the office of the county recorder of the county in which the property is located. Upon such recordation, the lien shall have the same force, effect, and priority as if it had been a judgment lien imposed upon real property which was not exempt from execution, except that it shall attach only to the property so posted and described in such notice of lien, and shall continue for 10 years from the time of the recording of such notice unless sooner released or otherwise discharged. Such lien may be foreclosed by an action brought by the city, county, other public agency, or state board, on behalf of the regional board, for a money judgment. Money recovered by a judgment in favor of the state board shall be returned to the State Water Pollution Cleanup and Abatement Account. [¶] (g) The city, county, other public agency, or state board on behalf of a regional board, may at any time release all or any portion of the property subject to a lien imposed pursuant to subdivision (f) from the lien or subordinate such lien to other liens and encumbrances if it determines that the amount owed is sufficiently secured by a lien on other property or that the release or subordination of such lien will not jeopardize the collection of such amount owed. A certificate by such board, city,

resolution requests local agencies to conduct the cleanup and if they fail to do so, then the regional board is required to perform the cleanup. (See fn. 2, *ante*.) In 1978, with no cleanup accomplished by Barry or by any local agency, the regional board retained a consulting engineer to recommend methods of pollution abatement. (See § 13305, subd. (e).) In 1979, the consulting engineer recommended construction of a limestone barrier, sedimentation basins, and a "neutralization" plant. The regional board sent out requests for proposals to do the recommended work. A second consulting engineering firm was retained to construct a pilot plant. In 1983 this engineering firm reported that the diversion-and-treatment process under consideration would entail a capital cost of over $500,000 plus substantial operating and maintenance costs. The regional board concluded these costs made the recommended work no longer feasible. The regional board then decided to reconsider sealing the mine although that alternative had earlier been rejected.

In the latter part of 1983 the regional board took action against the continuing water pollution on two fronts. First, on December 27, 1983, it filed this action in Plumas County Superior Court seeking, inter alia, preliminary and permanent injunctions requiring Barry to comply with the regional board's 1980 waste discharge requirement and cleanup and abatement order.[3] The regional board also sought civil penalties and other just and proper relief.

Second, in November and December of 1983 the regional board exercised the notice-and-hearing process of section 13305. (See § 13305, subds. (b), (c), (d).) Appropriate notices were posted at the mine; notices of hearing were sent to Barry and published in local newspapers; and the noticed public hearing was held. Following the hearing the regional board adopted Order No. 83-148 requesting local public entities to abate the pollution and authorizing the regional board to do so itself if the other agencies fail to do so. The requested agencies declined to abate the pollution and the regional board proceeded with the work.

On January 19, 1984, the regional board wrote to Barry stating that its engineering consultant, when selected, would need access to the mine to study the feasibility and design of a mine seal. The regional board also

---

county, or other public agency to the effect that any property has been released from such lien or that such lien has been subordinated to other liens and encumbrances shall be conclusive evidence that the property has been released or that the lien has been subordinated as provided in such certificate. [¶] (h) As used in this section, the words 'nonoperating' or 'not in operation' [mean] the business is not conducting routine operations usually associated with that kind of business."

[3] The action was brought in the name of the People acting by and through the regional board.

requested a meeting with Barry prior to February 1, 1984, to discuss any proposals by Barry for abating the pollution. Barry failed to grant the regional board or its consultant access to the mine; Barry also failed to proffer any ideas for curtailing the pollution.

In February of 1984 the regional board sent out requests for proposals for construction of the mine seal.

The following month the regional board sent Barry a second letter requesting access to the mine. Barry failed to respond to this letter. On June 6, 1984, the Attorney General contacted Barry's counsel by telephone and sent a confirming letter the next day. The letter explained, "Once the contract is awarded the contractor will need to examine the mine site to determine if a seal is feasible and to assist in formulating specifications for the job. Any seal would not be installed until the Summer of 1985."

Later in June of 1984 the contract was awarded to Steffen, Robertson and Kirsten, Consulting Engineers (SRK).

On June 29, 1984, Barry's counsel finally wrote to the Attorney General stating he was asking for a rehearing before the regional board. Barry's counsel noted that "Until the [Regional] Board reviews this request to reconsider sealing the mine, Mr. Barry cannot approve your request of access to Walker Mine for any bidder on the project or representative of the Board."

The regional board's reply letter stated in pertinent part: "While the Board gave Mr. Barry until 1 February 1984 to present an abatement plan, as a matter of practicability, Mr. Barry has had and still has much time before the Board could decide to implement it's [sic] own abatement plan. If Mr. Barry has a workable plan which can be implemented in a timely manner, then staff could work with him to implement the plan. [¶] If Mr. Barry would grant us access to the mine for the purpose of the feasibility study, this would show good faith and allow the Board to compare both the mine sealing proposal and Mr. Barry's proposal at the same time."

Barry did not timely respond to the regional board's letter; thus, on July 19, 1984, the regional board noticed a motion for an order from the trial court granting it entry onto the property to conduct its feasibility study. The notice of motion stated the motion would be made under section

13304;[4] in points and authorities, the regional board noted the motion was also authorized under section 13305.

In opposition to the motion, Barry submitted an affidavit stating he had retained water consultants to assist him in preparing a feasible plan for presentation to the regional board. Nonetheless, on August 30, 1984, the trial court granted the regional board's motion. Thereafter, in September 1984, the regional board and its engineers, SRK, entered the mine.

---

[4] Section 13304 provides: "(a) Any person who has discharged or discharges waste into the waters of this state in violation of any waste discharge requirement or other order or prohibition issued by a regional board or the state board, or who has caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance, shall upon order of the regional board clean up such waste or abate the effects thereof or, in the case of threatened pollution or nuisance, take other necessary remedial action. Upon failure of any person to comply with such cleanup or abatement order, the Attorney General, at the request of the board, shall petition the superior court for that county for the issuance of an injunction requiring such person to comply therewith. In any such suit, the court shall have jurisdiction to grant a prohibitory or mandatory injunction, either preliminary or permanent, as the facts may warrant. [¶] (b) The regional board may expend available moneys to perform any cleanup, abatement, or remedial work required under the circumstances set forth in subdivision (a) which in its judgment is required by the magnitude of endeavor or urgency of prompt action needed to prevent substantial pollution, nuisance, or injury to any waters of the state. Such action may be taken in default of, or in addition to, remedial work by the waste discharger or other persons, and regardless of whether injunctive relief is being sought. The regional board may perform the work itself, or by or in cooperation with any other governmental agency, and may use rented tools or equipment, either with operators furnished or unoperated. Notwithstanding any other provisions of law, the regional board may enter into oral contracts for such work, and the contracts, whether written or oral, may include provisions for equipment rental and in addition the furnishing of labor and materials necessary to accomplish the work. Such contracts shall be exempt from approval by the Department of General Services pursuant to the provisions of Section 14780 of the Government Code. [¶] (c) If such waste is cleaned up, the effects thereof abated, or, in the case of threatened pollution or nuisance, other necessary remedial action is taken by any governmental agency, the person or persons who discharged the waste, discharges the waste, or threatened to cause or permit the discharge of the waste within the meaning of subdivision (a), shall be liable to that governmental agency to the extent of the reasonable costs actually incurred in cleaning up such waste, abating the effects thereof, or taking other remedial action. The amount of such costs shall be recoverable in a civil action by, and paid to, such governmental agency and the state board to the extent of the latter's contribution to the cleanup costs from the State Water Pollution Cleanup and Abatement Account or other available funds. [¶] (d) If, despite reasonable effort by the regional board to identify the person responsible for the discharge of waste or the condition of pollution or nuisance, such person is not identified at the time cleanup, abatement, or remedial work must be performed, the regional board shall not be required to issue an order under this section. [¶] (e) 'Threaten,' for purposes of this section, means a condition creating a substantial probability of harm, when the probability and potential extent of harm make it reasonably necessary to take immediate action to prevent, reduce, or mitigate damages to persons, property, or natural resources. [¶] (f) This section does not impose any new liability for acts occurring before January 1, 1981, if the acts were not in violation of existing laws or regulations at the time they occurred."

Sometime after the initial entry, SRK determined an additional inspection of the mine would be necessary and on May 21, 1985, the regional board noticed a second motion for entry. Once again, the regional board relied in part on section 13305 to support its motion. Barry again opposed the motion, this time alleging he was negotiating for a pollution control plan developed by the Canadian government. On June 13, 1985, the trial court granted the motion.

Barry did not comply with the trial court's order and on January 23, 1986, he was adjudged in contempt.

Eventually, SRK completed its study and recommended that the mine be sealed. Thereafter, on February 28, 1986, the regional board held a public hearing pursuant to section 13305 to consider, first, whether the regional board should adopt a negative declaration for the mine seal project under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.), and second, whether the regional board should direct its executive secretary to have the mine sealed in accordance with SRK's recommendation.

At the hearing, Barry presented a new proposal put together by a consultant who had been hired just seven weeks prior to the hearing. Under this proposal the relatively "good" quality water flows would be diverted from the depths of the mine to the surface while the relatively "poor" quality flows would be diverted to the lower workings of the mine. The regional board's executive officer pointed out, however, that Barry's "so-called high quality water is between 30 or [sic] 50 times more potent than it takes to kill fish. . . ." Barry's consultant then admitted that the proposed plan was only a "first step."

Barry's consultant also cast doubt on Barry's claim that sealing the mine would render inaccessible a strategically important resource for copper. He testified that the mine would probably be mined for gold rather than copper and that it might be mined from the surface rather than underground.

Following the hearing, on February 28, 1986, the regional board adopted Resolution No. 86-056 approving the negative declaration. Thereafter, pursuant to section 13305, the regional board adopted Resolution No. 86-057 directing the executive officer to seal the mine.

On March 28, 1986, Barry petitioned the state board for review of the regional board's resolutions adopting the negative declaration and approv-

ing the abatement project. In his petition Barry contended the regional board's approval of Resolution No. 86-056 (the negative declaration) was inappropriate because: (1) the initial study supporting the negative declaration failed to consider alternatives to the proposed action; (2) comments on the initial study identified potential adverse environmental impacts for which no mitigation was provided; (3) the regional board's responses to comments were prepared by persons unqualified to make responses, and (4) the regional board should not be permitted to file a negative declaration for a physical action (sealing the mine) when other agencies are required to file an environmental impact report (EIR) for a nonphysical action.

Barry contended the regional board's approval of Resolution No. 86-057 was inappropriate because: (1) sealing of the mine is a de facto closure of the mine which must be approved by the State Mining and Geology Board; (2) sealing the mine will not halt the formation of acid water at the mine, and (3) the regional board's order is premature because the state board is considering an appeal of certain water quality standards.

On May 1, 1986, the state board denied Barry's petition for review. The state board wrote: "The State Board has decided not to review the petition because it fails to raise substantial issues that are appropriate for review (California Administrative Code, Title 23, Section 2052(a)(1))." The state board went on to explain its views at length.[5]

On May 2, 1986, the regional board wrote to Barry requesting him to provide access to the underground workings of Walker Mine during the week of June 10 through June 17, 1986. Barry initially approved the access request but later, through his engineering representative, he qualified his approval by stating that all persons going underground would be required to sign an agreement of indemnity for entry onto the land.

Thereafter, on May 29, 1986, the regional board noticed a motion for entry onto the mine property to perform the cleanup work. The notice of motion expressly relied on sections 13304 and 13305.

---

[5] On May 30, 1986, Barry filed a petition for writ of mandate and request for temporary stay in Sacramento County Superior Court. This petition challenges the state board's denial of Barry's petitions for review. On June 25, 1986, the Sacramento Superior Court issued an alternative writ.

In this appeal we review only the actions of the Plumas County Superior Court. We have been furnished only the alternative writ in the Sacramento proceeding. We do not review that proceeding here and have no basis to determine whether the alternative writ was properly granted.

Following a hearing the trial court granted the regional board's motion and entered an order commanding Barry to allow board staff and contractors to enter the mine.[6] Barry appeals from this order.[7]

## DISCUSSION

## I

*Overview of the Porter-Cologne Water Quality Control Act.*

This court has recently provided an overview of the Porter-Cologne Act: "By the enactment of the Porter-Cologne Act, the Legislature declared that 'the people of the state have a primary interest in the conservation, control, and utilization of the water resources of the state, and that the quality of all the waters of the state shall be protected for use and enjoyment by the people of the state.' (Wat. Code, § 13000.) As the Court of Appeal observed in *Hampson* v. *Superior Court* (1977) 67 Cal.App.3d 472 [136 Cal.Rptr. 722], . . . '[t]he state water quality control legislation is designed to regulate the factors and activities which may affect the quality of the waters of the state, in order to protect the quality of water for the use and enjoyment of all of the people of the state. To this end, the Legislature has established a legislative procedure for the development of a statewide program of water quality control. The plan provides for regional administration within the framework of statewide coordination and policy.' (*Id.,* at p. 484.) The state is divided into nine regions for purposes of the Porter-Cologne Water Quality Control Act, each of which is governed by a regional board. (Wat. Code, §§ 13200, 13201.) . . . Each regional board is mandated to 'formulate and adopt water quality control plans for all areas within the region.' (Wat. Code, § 13240.) In those plans the regional board is directed to establish such water quality objectives as will 'ensure the reasonable protection of

---

[6]The order provides in pertinent part: "IT IS ORDERED that defendants Robert R. Barry and Calicopia Corporation provide access to and allow Board staff and prospective bidders for a contract to seal the mine, pursuant to the duly adopted Resolution 86-057 of the California Regional Water Quality Control Board, Central Valley Region ("Board"), to enter the properly [*sic*] commonly known as Walker Mine, Plumas County. Such access shall be for the week of June 27, 1986, and for the purpose of permitting site inspection by the prospective bidders.

"IT IS FURTHER ORDERED that defendants Robert R. Barry and Calicopia Corporation provide access to and allow the Board, the selected contractor and their agents and employees to enter Walker Mine for the period from August 1, 1986, until November 1, 1986, for the purpose of carrying out the contract entered pursuant to Resolution 86-057 for construction of a seal in the main adit of the mine as a water pollution abatement project, and additionally for the purpose of conducting any postconstruction inspections."

[7]We agree with Barry that the trial court's order is in the nature of an injunction and is appealable. (Code Civ. Proc., § 904.1, subd. (f).)

beneficial uses [of waters of the state] and the prevention of nuisance . . . .' (Wat. Code, § 13241.) . . . [¶] . . . Administrative review of the action of a regional board is by petition to the State Board. (Wat. Code, § 13320, subd. (a).) If dissatisfied with the decision of the State Board, any aggrieved party may seek timely judicial review by way of a writ of mandate. (Wat. Code, § 13330, subd. (a).)" (*Committee for a Progressive Gilroy* v. *State Water Resources Control Bd.* (1987) 192 Cal.App.3d 847, 855-856 [237 Cal.Rptr. 723].)

## II

*The State Board Has Discretion to Deny Review of Regional Board Orders. Because the State Board Properly Denied Review, the Regional Board's Orders Were Final and Properly Relied on by the Trial Court.*

Barry first contends the regional board's resolutions were not final and its attempt to have them judicially enforced was therefore premature. ■■■ Barry contends the controlling statute, section 13320,[8] and the state board's regulation promulgated thereunder (Cal. Admin. Code, tit. 23, § 2052)[9]

---

[8] Section 13320 provides:. "(a) Within 30 days of any action or failure to act by a regional board under subdivision (c) of Section 13225, Article 4 (commencing with Section 13260) of Chapter 4, Chapter 5 (commencing with Section 13300), Chapter 5.5 (commencing with Section 13370), or Chapter 7 (commencing with Section 13500), any aggrieved person may petition the state board to review such action or failure to act. In case of failure to act, the 30-day period shall commence upon refusal of the board to act, or 60 days after request has been made to the board to act. The state board may, on its own motion, at any time review such action or failure to act and also any failure to act under Article 3 (commencing with Section 13240) of Chapter 4. [¶] (b) The evidence before the state board shall consist of the record before the regional board, and any other relevant evidence which, in the judgment of the state board, should be considered to effectuate and implement the policies of this division. [¶] (c) The state board may find the regional board action or inaction to be appropriate and proper. Upon finding that the action of the regional board, or the failure of the regional board to act, was inappropriate or improper, the state board may direct that the appropriate action be taken by the regional board, refer the matter to any other state agency having jurisdiction, take the appropriate action itself, or do any combination of the foregoing. In taking any such action, the state board is vested with all the powers of the regional boards under this division. [¶] (d) In the event a waste discharge in one region affects the waters in another region and there is any disagreement between the regional boards involved as to the requirements which should be established, either regional board may submit the disagreement to the state board which shall determine the applicable requirements."

[9] California Administrative Code, title 23, section 2052 provides: "(a) The state board may: [¶] (1) Refuse to review the action or failure to act of the regional board if the petition fails to raise substantial issues that are appropriate for review, or [¶] (2) After review of the regional board's records pertaining to the matter, including the transcript of any hearing held by the regional board: [¶] (A) Deny the petition upon a finding that the action or failure to act of the regional board was *appropriate and proper*; or [¶] (B) Set aside or modify the regional board order; or [¶] (C) Direct the regional board to take appropriate action. [¶] Before taking final action, the state board may, in its discretion, hold a hearing for the purpose of oral argument or receipt of additional evidence or both. [¶] (b) If a hearing is held the board shall give rea-

provide a right to appeal regional board decisions to the state board which is required to review them. Because the state board refused to do so, Barry contends the regional board's resolutions were not final orders. Neither the statute nor the regulation supports Barry's argument.

A. *Section 13320 gives the state board discretion to decline to review regional board orders.*

Section 13320 provides in pertinent part: "*Within 30 days of any action or failure to act by a regional board under . . . Chapter 5 (commencing with section 13300), . . . any aggrieved person may petition the state board to review such action or failure to act.*" (§ 13320, subd. (a); italics added.) As Barry properly suggests, the state board is expressly permitted to review regional board orders and to "[find] that the action of the regional board, or the failure of the regional board to act, was inappropriate or improper, . . ." (§ 13320, subd. (c).) The question, however, is not whether the state board is permitted to review regional board orders but whether it is *required* to do so in every case brought before it. As we shall see, the state board has discretion to deny petitions for review.

■ When construing any statute, the fundamental rule is that a court should ascertain the intent of the Legislature so as to effectuate the law's purpose, and in determining intent the court first turns to the words used. (*People* v. *Overstreet* (1986) 42 Cal.3d 891, 895 [231 Cal.Rptr. 213, 726 P.2d 1288].) Here, the Legislature specified that state board review was by "petition" rather than by "appeal." As the Attorney General points out, the term "petition" is commonly associated with discretionary rather than mandatory review. Thus, for example, discretionary review in our Supreme Court is by *petition* for review. (Rule 28, Cal. Rules of Court.) Conversely, review as a matter of right in California's intermediate appellate courts is by

---

sonable notice of the time and place and of the issues to be considered to the petitioner, the discharger, if not the petitioner, the regional board, any interested persons who have filed a response to the petition pursuant to Section 2050 and such other persons as the board deems appropriate. [¶] (c) If a hearing is held, the board in its discretion may require that, not later than ten days prior to the hearing, all interested parties intending to participate shall submit to the board in writing the name of each witness who will appear, together with a statement of the qualifications of each expert witness, the subject of the proposed testimony, and the estimated time required by the witness to present his direct testimony. The board may also require that copies of proposed exhibits be supplied to adverse parties and seven copies be supplied to the board not later than ten days prior to the hearing. [¶] (d) If formal disposition of the petition is not made by the state board within 270 days of the written notification provided for in Section 2050.5, the petition is deemed denied. This time limit may be extended for a period not to exceed 60 days by written agreement between the state board and the petitioner."

way of "appeal." (Rule 1, Cal. Rules of Court.) The Legislature's choice of review *by petition* suggests review was intended to be discretionary.[10]

The discretionary nature of state board review is suggested as well by subdivision (d) of section 13320 which provides: "In the event a waste discharge in one region affects the waters in another region and there is any disagreement between the regional boards involved as to the requirements which should be established, either regional board may submit the disagreement to the state board *which shall determine the applicable requirements.*" (Italics added.) This subdivision states an exception to the general rule of discretionary review. Thus, where two regional boards disagree, state board review is not discretionary but mandatory. However, if the *entire* statute were construed to require mandatory review this provision in subdivision (d) would be unnecessary. ■ We must reject such an interpretation because " 'a construction making some words surplusage is to be avoided.' " (*Steketee* v. *Lintz, Williams & Rothberg* (1985) 38 Cal.3d 46, 52 [210 Cal.Rptr. 781, 694 P.2d 1153], quoting *Palos Verdes Faculty Assn.* v. *Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 658-659 [147 Cal.Rptr. 359, 580 P.2d 1155].)

Our construction of section 13320 is also supported by its legislative history. Section 13320's statutory predecessors are former sections 13025 and 13025.5, enacted as part of the Dickey Water Pollution Act which preceded the Porter-Cologne Act. (Former § 13000 et seq.; Deering's Ann. Wat. Code, § 13320, p. 63; 24 Ops.Cal.Atty.Gen. 266, 267 (1954).) As originally enacted in 1949, former section 13025 provided in pertinent part: "Whenever a regional board fails to take or obtain appropriate action to correct any particular existing or threatened condition of pollution, the state board shall direct that action to correct the condition be taken by any state agency having jurisdiction or may, itself, take such action." (Stats. 1949, ch. 1549, § 1, p. 2785.)

Former section 13025 was construed by the Attorney General in a 1955 opinion. There, the state board's predecessor agency requested an opinion on the question, "What authority and duty does the State Water Pollution Control Board have to review the action of a regional water pollution

---

[10] We note that in *Hampson* v. *Superior Court, supra,* 67 Cal.App.3d 472. the court stated, in dicta, that "If the regional board had proceeded by way of waste discharge requirements under section 13262, the real parties in interest would have had the right *to appeal* to the state board within 30 days of the regional board's action. (Wat. Code, § 13320.)" (*Id.,* at p. 482; italics added.) However, the question whether state board review was by petition or by appeal was not presented in that case. To the extent *Hampson* is inconsistent with our conclusion we decline to follow it.

control board in correcting any particular existing or threatened condition of pollution, and what procedure must be followed in such review?" (24 Ops.Cal.Atty.Gen., *supra*, at p. 266.)[11]

The Attorney General concluded in pertinent part: "Section 13025 does not establish any procedure by which the question of the appropriateness of regional board action is to be raised. . . . In other words, there is no provision for automatic review by the State board of the appropriateness of all regional board action concerning particular conditions of pollution. [¶] By its silence, section 13025 leaves it to the discretion of the State board to decide what will cause it to review the appropriateness of regional board action and what type of review it will make." (*Id.,* at p. 270.)

Thus, from its inception, former section 13025 was construed to permit the state board discretion whether to review actions taken by regional boards. As originally enacted, state board review was available only on the state board's own motion. (*Ibid.*)

In 1965, former section 13025 was substantially reworded and former section 13025.5 was added. (Stats. 1965, ch. 1656, §§ 2, 3, pp. 3759-3760.) In making these changes the Legislature reinforced the existing interpretation that state board review was discretionary. As amended, former section 13025 expressly declared that *"Any action* of a regional board pursuant to Section 13053, 13054, 13054.1, or 13054.3, or the failure of a regional board to act *may be reviewed by the state board* . . . ." (Italics added.) (*Ibid.*)

Former section 13025.5 was amended in 1967 in ways not here pertinent. (Stats. 1967, ch. 284, § 146.3, p. 1453.) Thus, before the adoption of the Porter-Cologne Act in 1969, the state board's discretion to review regional board actions was well established.

Section 13320 was enacted as part of the Porter-Cologne Act, which accomplished a major revision of the statutes governing water quality control. (Stats. 1969, ch. 482; see § 13020.) Uncodified section 36 of the enacting statute provides: "This act is intended to implement the legislative recommendations of the final report of the State Water Resources Control Board submitted to the 1969 Regular Session of the Legislature entitled 'Recommended Changes in Water Quality Control,' prepared by the Study

---

[11] The Attorney General noted his opinion was confined to the question of state board responsibility for review pertaining to the correction of *particular* conditions of *pollution,* as in this case. (*Id.,* at p. 267.)

Project—Water Quality Control Program." (Hereafter *Recommended Changes.*)[12]

■ This court accords substantial weight to the state board's report because, " '[r]eports of commissions which have proposed statutes that are subsequently adopted are entitled to substantial weight in construing the statutes.' [Citations.]" (*People* v. *Superior Court (Carl W.)* (1975) 15 Cal.3d 271, 277 [124 Cal.Rptr. 47, 539 P.2d 807], quoting *Van Arsdale* v. *Hollinger* (1968) 68 Cal.2d 245, 249-250 [66 Cal.Rptr. 20, 437 P.2d 508].) This is particularly true where, as here, the Legislature expressly states its intent is to implement the recommendations of the board's report.

The state board's report contained a proposed text for section 13320. The proposal included, for the first time, express authority for "aggrieved person[s]" to petition the state board for review. This was a departure from prior law where state board review was available only on its own motion. However, the state board was not obligated to grant each petition that came before it. The proposed statute provided, "Upon petition by any aggrieved person or upon its own motion, the state board *may* at any time review any action or failure to act by a regional board . . . ." (*Recommended Changes, supra,* at p. 70, italics added.)

The proposed section 13320 was followed by a note which provided in pertinent part: "Note. Based on repealed section 13025 and 13025.5. *The state board has a discretion whether to review any action or failure to act by a regional board.*" (*Recommended Changes, supra,* at p. 71, italics added.) Thus, the state board's intent was expressly to preserve the discretion it had enjoyed under former section 13025 as amended. The Legislature enacted section 13320 with the above-quoted language intact. (Stats. 1969, ch. 482, § 18, p. 1068.) Although the section has since been amended,[13] none of the amendments suggests an intent to restrict the state board's review discretion. ■ We conclude section 13320 permits the state board discretion whether to review regional board orders.

The state board's report also contained a proposed text for section 13330 which establishes a mechanism of judicial review.[14] As proposed, section

---

[12] We take judicial notice of the state board's final report. (Evid. Code, §§ 452, subd. (c), 459.)

[13] Section 13320 was amended in 1970 (Stats. 1970, ch. 902, § 1.5, ch. 956, § 2); 1971 (Stats. 1971, ch. 1288, § 12); and 1975 (Stats. 1975, ch. 888, § 1) in ways not here pertinent.

[14] Section 13330, as adopted, provides: "[¶] (a) Within 30 days after service of a copy of a decision and order issued by the state board under Section 13320, any aggrieved party may file with the superior court a petition for a writ of mandate for review thereof. Failure to file

13330 provided in pertinent part that "(a) Within thirty days after service of a copy of a decision and order issued by the state board under section 13320, any aggrieved party may file with the superior court a petition for writ of mandate for review thereof." (*Recommended Changes, supra,* at p. 72.)

Section 13330 was enacted virtually as proposed. (See fn. 14, *ante.*) It is noteworthy because it does not expressly provide for superior court review of regional board actions where the state board chooses to deny a petition for review. We believe this omission is attributable to oversight and is readily remedied by construing section 13330 to provide that the state board shall exercise its discretion to deny review by issuing a "decision and order" to that effect, as was actually done in this case. That decision and order is subject to judicial review, not of the state board's exercise of discretion in denying review but rather of the merits of the regional board's action. We do not read section 13330 as negating the existence of state board discretionary review because the statute was drafted by the state board concurrently with section 13320 and its accompanying note expressly authorizing discretionary review. Indeed, section 13330 proximately followed section 13320 in the state board's report. (*Recommended Changes, supra,* at pp. 70-72.) We conclude the state board possesses statutory discretion to deny review of regional board actions.

B. *The state board has not abandoned its discretion through regulation.*

■ In his reply brief and at oral argument, Barry contended the state board has narrowed the scope of its statutory discretion by administrative regulation. In furtherance of its powers under section 13320, the state board has promulgated California Administrative Code, title 23, section 2052 which provides in pertinent part: "(a) The state board may: [¶] (1) Refuse to review the action or failure to act of the regional board *if the petition fails to raise substantial issues that are appropriate for review, . . .*" (Italics added; see fn. 9, *ante.*)

---

such an action shall not preclude a party from challenging the reasonableness and validity of a decision or order of a regional board or the state board in any judicial proceedings brought to enforce such decision or order or for other civil remedies. [¶] (b) The evidence before the court shall consist of the record before the state board, including the regional board's record, and any other relevant evidence which, in the judgment of the court, should be considered to effectuate and implement the policies of this division. In every such case, the court shall exercise its independent judgment on the evidence. [¶] (c) Except as otherwise provided herein, the provisions of subdivisions (e) and (f) of Section 1094.5 of the Code of Civil Procedure shall govern proceedings pursuant to this section."

Barry contends the state board has no discretion to deny petitions which do, in fact, raise substantial issues. However, the crucial question is: Who decides whether a petition raises substantial issues appropriate for review? The state board or the courts? We conclude the state board retains unreviewable discretion to determine what issues are "substantial" and whether they are "appropriate for review."

Once again, we are aided by statutory archaeology. Our conclusion was foreshadowed over 30 years ago in the Attorney General opinion discussed *ante.* Under former section 13025 the state board was authorized to review regional board decisions "Whenever a regional board *fails to take or obtain appropriate action.*" (Stats. 1949, ch. 1549, § 1, p. 2785, italics added.) The Attorney General concluded the question of appropriateness was committed to the state board's sound discretion. (24 Ops.Cal.Atty.Gen, *supra,* at p. 270.) The Attorney General noted that "a request for review need not be honored. The State board could be unconvinced by the request that sufficient doubt had been raised of the appropriateness of regional board action to warrant a review and could consequently decline to have one made." (*Ibid.*)

In its administrative regulation, the state board has perpetuated the concept of "appropriateness," albeit the appropriateness of review rather than of the underlying action. Needless to say, however, the two go hand in hand.

Moreover, had the state board intended to depart from its longstanding discretion to review the appropriateness of regional board actions it could easily have said so in clear and certain terms. It did not do so; instead, it spoke in terms long construed as establishing discretionary review.

Finally, our conclusion is supported by two considerations of policy. First, the question whether an issue is "substantial," and whether review of the issue is "appropriate," does not depend wholly upon the issue's potential for facial legal intrigue. Rather, whether the state board deems the issue of substantial interest depends in large measure on matters within the peculiar knowledge and expertise of the state board, such as whether it has considered the same or similar matters in the past, whether the tendered issue is of statewide importance in the regulation of water quality, and finally, whether the state board makes a prudent allocation of time and resources by considering the tendered issue.

Second, a policy of mandatory review would needlessly impose a second level of judicial review on the agency, that is, review of whether state board review should occur at all. The added review would result in greater ex-

pense to the taxpayers and significant delay in the implementation of orders of the board. Such review would merely postpone the aggrieved citizen's resort to judicial review of orders of regional boards. We perceive no reason of policy supporting a hall-of-mirrors requirement of review of the question of review.

■■ For all the cited reasons, we hold the state board had unreviewable discretion to deny Barry's petition for review. Thus, when the state board denied Barry's petition for review, the regional board's orders were final. At that point, Barry could have challenged those orders by way of mandate in the superior court[15] and the regional board was free to seek enforcement of those orders in the trial court.

## III

*Section 13305 Permits the Regional Board to Abate Pollution at the Walker Mine.*[16]

Barry contends the trial court's order cannot be sustained under section 13305.

■■ Section 13305 does not expressly authorize trial courts to grant regional boards access to private property. However, such authority is necessarily implied in section 13305, subdivision (e), which *requires* regional boards to clean up conditions of pollution when they exist, as here, on private property. " '[W]hatever is necessarily implied in a statute is as much a part of it as that which is expressed.' " (*Welfare Rights Organization* v. *Crisan* (1983) 33 Cal.3d 766, 771 [190 Cal.Rptr. 919, 661 P.2d 1073, 31 A.L.R.4th 1214], quoting *Johnston* v. *Baker* (1914) 167 Cal. 260, 264 [139 P. 86]; see *County of Yolo* v. *Francis* (1986) 179 Cal.App.3d 647, 653 [224 Cal.Rptr. 585].) In heeding their mandate that "In the event that such city, county, or other public agency does not abate such condition within a reasonable time *the board shall cause the condition to be abated,* " (§ 13305, subd. (e), italics added) the regional boards inevitably must enter onto private property where the "condition" of pollution is located thereon. Often, as here, the regional board's entry will be without the property

---

[15] Barry chose not to challenge the regional board's orders but rather to attack the ability of the state board to deny review. While we have no reason to question Barry's good faith, we note his choice of tactics was one that held out the most promise of delay.

[16] Barry contends section 13304 does not authorize the regional board to undertake its remedial measures in this case. It is unnecessary to consider Barry's argument at length because section 13305 provides sufficient authority to sustain the regional board's actions and the trial court's orders. Moreover, the regional board purported to act solely under section 13305 and not under section 13304.

owner's consent. It is entirely proper for regional boards to seek judicial authorization where consent is not forthcoming. Section 13305 impliedly authorizes trial courts to authorize entry in proper cases. A contrary conclusion would emasculate the statute.

■ Barry claims the regional board failed to show that section 13305 applies on these facts. He first notes section 13305 applies only where the regional board determines "that a condition of pollution or nuisance exists which has resulted from a nonoperating industrial or business location within its region, . . ." (§ 13305, subd. (a).) Barry contends the regional board's complaint fails to allege such a determination has been made. Barry ignores the record.

The regional board's complaint incorporated exhibit A which provides in pertinent part: "The California Regional Water Quality Control Board, Central Valley Region . . . finds that: [¶] 1. *The Walker Mine,* owned by the Calicopia Corporation and Robert R. Barry, (hereinafter discharger), *is a non-operating copper mine* located in east central Plumas County, . . ." (Italics added.) The complaint also incorporated exhibit B which provided in pertinent part: "Information in the Board's files, including investigations by Board staff and the Department of Fish and Game, and reports by engineering and mining consultants, demonstrates that the discharger has violated and continues to violate the requirements listed above and that *the discharge has created a condition of pollution . . . .*" (Italics added.) The complaint adequately alleged the requirements for application of section 13305.[17]

■ Barry also contends the regional board failed to make findings of fact sufficient to support its cleanup resolution (No. 86-057), citing *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 515 [113 Cal.Rptr. 836, 522 P.2d 12]. Barry has waived this claim. The doctrine of exhaustion of administrative remedies provides that, with exceptions not applicable here (see *County of Contra Costa* v. *State of California* (1986) 177 Cal.App.3d 62, 74-78 [222 Cal.Rptr. 750]), a litigant may not assert in court claims of correctable administrative agency error that were not tendered to the agency. (See *Lindeleaf* v. *Agricultural Labor Relations*

---

[17] In his brief Barry says he "asserted [in the trial court] that a 'motion' to effectuate the ultimate remedy of sealing the mine in the underlying civil action cannot be based on Section 13305 since that section appears nowhere in the complaint." Assuming Barry renews this claim on appeal, it fails because he has asserted it without any citation of authority. "Where a point is merely asserted by appellant's counsel without any argument of or authority for the proposition, it is deemed to be without foundation and requires no discussion by the reviewing court." (*Atchley* v. *City of Fresno* (1984) 151 Cal.App.3d 635, 647 [199 Cal.Rptr. 72].) In any event, Barry can claim no prejudice because the record shows he was put on notice some two years before the hearing at issue that the regional board was relying on section 13305.

*Bd.* (1986) 41 Cal.3d 861, 869-870 [226 Cal.Rptr. 119, 718 P.2d 106]; *Guardians of Turlock's Integrity* v. *Turlock City Council* (1983) 149 Cal.App.3d 584, 600 [197 Cal.Rptr. 303]; *City of Walnut Creek* v. *County of Contra Costa* (1980) 101 Cal.App.3d 1012, 1019-1021 [162 Cal.Rptr. 224]; *Running Fence Corp.* v. *Superior Court* (1975) 51 Cal.App.3d 400, 429 [124 Cal.Rptr. 339].) Barry's claim that the regional board made inadequate findings was correctable by the state board, but Barry never tendered the issue to that board in his petition for review. Thus, neither the trial court nor this court may consider it in the first instance.[18] (*Ibid.*)

█ Barry next contends there is insufficient evidence to support a finding that Walker Mine is a "nonoperating industrial or business location." He contends "the evidence merely establishes that the Walker Mine is presently inactive and is not operating as a copper mine." Barry errs.

Section 13305, subdivision (h) provides: "As used in this section, the words 'nonoperating' or 'not in operation' means the business is not conducting routine operations usually associated with that kind of business." (See fn. 2, *ante.*)

The record shows no ore has been extracted from the mine for sale on a commercial basis since World War II.

Barry's own testimony at the February 1986 regional board hearing established that he and his lessee were not conducting the routine operations usually associated with mining but at best were engaged in preliminary exploratory research. Barry testified: "$25,000 was spent in geology on the mine last year and an additional amount of money was spent by me, . . . we're not operating from the standpoint of rock in the box. That's true. But we're out there proving ore, and the big companies will not spend the $15,000,000 to $25,000,000 to recreate the plant until we have [$1 billion] worth of ore, and unfortunately we only have half of that. We only have $500,000,000 worth of ore there, and the big companies are not interested." When asked when the lessees anticipated opening the mine, Barry answered: "Well, I can't answer that. I don't know. I doubt very much if it will ever be mined in an underground operation. [¶] So, the exploratory work underground is more for water pollution than it is for mining. We'll probably never mine underground." When asked what type of mining method the lessee would use Barry answered, "I have no idea what they're going to use. They don't know themselves."

---

[18]Even assuming the point could properly be raised it would have to be rejected. Resolution No. 86-057 recites numerous findings supporting the cleanup. These findings bridge the gap between the evidence and the regional board's order and are therefore adequate. (*Topanga, supra,* 11 Cal.3d at p. 515.)

The evidence overwhelmingly establishes the Walker Mine was not "conducting routine operations usually associated with" a mine and was "not in operation" within the meaning of section 13305, subdivision (h).

## IV

*Section 13360 Does Not Apply to Cleanups Undertaken by the Regional Board.*

In Resolution No. 86-057 the regional board "RESOLVED , that the Executive Officer shall take steps necessary to seal the mine in accordance with the SRK Report; . . ." Barry next contends the regional board's resolution runs afoul of section 13360,[19] which provides in pertinent part that: "[n]o . . . order of a regional board . . . issued under this division shall specify the design, location, type of construction, or particular manner in which compliance may be had with that requirement, order, decree, and the person so ordered shall be permitted to comply with the order in any lawful manner." Once again, Barry errs.

Barry assumes, without citing any authority, that section 13360 applies to the regional board's resolutions declaring its own course of conduct. It does not. Section 13360 applies to "person[s] . . . ordered . . . to comply with . . ." regional board orders, in other words, to dischargers ordered to obey the regional board's rules and regulations. (See *Pacific Water Conditioning Assn., Inc.* v. *City Council* (1977) 73 Cal.App.3d 546, 554 [140 Cal.Rptr. 812].)

---

[19] Section 13360 provides: "(a) No waste discharge requirement or other order of a regional board or the state board or decree of a court issued under this division shall specify the design, location, type of construction, or particular manner in which compliance may be had with that requirement, order, or decree, and the person so ordered shall be permitted to comply with the order in any lawful manner. However, the restrictions of this section shall not apply to waste discharge requirements or orders or decrees with respect to any of the following: [¶] (1) Discharge of solid waste to disposal sites other than evaporation ponds from which there is no drainage or seepage which requires the installation of riprap, the construction of walls and dikes, the installation of surface and underground drainage facilities to prevent runoff from entering the disposal area or leakage to underground or surface waters, or other reasonable requirements to achieve the above or similar purposes. [¶] (2) Discharges of waste or fluid to an injection well, except any well which is regulated by the Division of Oil and Gas in the Department of Conservation pursuant to Division 3 (commencing with Section 3000) of the Public Resources Code and Subpart F of Part 147 of Title 40 of the Code of Federal Regulations and is in compliance with that division and Subpart A (commencing with Section 146.1) of Subchapter D of Chapter 1 of Title 40 of the Code of Federal Regulations. [¶] (b) If the court, in an action for an injunction brought under this division, finds that the enforcement of an injunction restraining the discharger from discharging waste would be impracticable, the court may issue any order reasonable under the circumstances requiring specific measures to be undertaken by the discharger to comply with the discharge requirements, order, or decree."

As previously noted, section 13305 requires the regional board, in proper cases, to cause pollution to be abated. The regional board "may proceed by force account, contract or other method deemed most expedient by the board . . . ." (§ 13305, subd. (e); see fn. 2, *ante.*) Thus, before undertaking any cleanup, the regional board must choose from among its available options. If section 13360 applied to the regional board it could not make its choice by resolution because by so doing it would impermissibly specify the "particular manner in which compliance may be had." (§ 13360, subd. (a).) The regional board would have to make its choice in silence, an obviously absurd result.

" 'Statutes must be given a reasonable and common sense construction in accordance with the apparent purpose and intention of the lawmakers—one that is practical rather than technical, and that will lead to a wise policy rather than to mischief or absurdity.' " (*People* v. *Aston* (1985) 39 Cal.3d 481, 492 [216 Cal.Rptr. 771, 703 P.2d 111], quoting *People* v. *Clark* (1966) 241 Cal.App.2d 775, 780 [51 Cal.Rptr. 7].) Section 13360 does not preclude the regional board from specifying by resolution how it will clean up a source of pollution. There was no error.

V

*Section 13305 Provides Independent Authority for the Regional Board's Cleanup of the Mine.*

Barry finally contends the regional board should have pursued an injunction under section 13304 and civil penalties under section 13386 rather than exercise self-help under section 13305. However, Barry proffers no explanation why section 13305 cannot apply to the instant facts. Only section 13305 permits the regional board to abate a condition of pollution where an obstreperous polluter refuses to do so. That is the situation here.

CONCLUSION

The record plainly shows that acid from Walker Mine has poisoned tributaries of the Feather River since the end of World War II. In that same period of time, ore has not been extracted from the mine and sold on a commercial basis. For nearly 30 years, the board has tried repeatedly to compel Barry to stop the pollution by his private means. The record is replete with instances of Barry's delaying tactics.

In these circumstances, the regional board properly chose to use its statutorily authorized self-help remedies to comply with its mandatory duty to

abate the pollution. (§ 13305.) The order it obtained to do so was lawful. Forty years of dead streams are enough.

## DISPOSITION

The order appealed from is affirmed. The writ of supersedeas issued August 14, 1986, is vacated for all purposes.

Carr, Acting P. J., and Park, J.,* concurred.

---

* Assigned by the Chairperson of the Judicial Council.