Filed 6/16/15  Backcountry Against Dumps v. State Water Resources Control Bd. CA3

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Sacramento)

----

| | |
|---|---|
| BACKCOUNTRY AGAINST DUMPS et al., | |
| Plaintiffs and Appellants, | C072073 |
| v. | (Super. Ct. No. 34201180000787CUWMGDS) |
| STATE WATER RESOURCES CONTROL BOARD, | |
| Defendant and Respondent; | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| SAN DIEGO GAS & ELECTRIC COMPANY, Real Party in Interest and Respondent. | [NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion filed May 19, 2015, in the above cause is modified as follows:

On page 28, delete footnote 8, which will require renumbering of all subsequent footnotes.

On page 29, delete the first paragraph and replace it with the following paragraph:

Petitioners also argue they need not have exhausted administrative remedies with respect to their findings claim because the claim presented "no new facts," but instead raised "a question of law."  In support of this argument, petitioners cite federal authority interpreting NEPA.  For example, in *Dept. of Transportation v. Public Citizen* (2004) 541 U.S. 752, the United States Supreme Court explained that "an EIS' flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a

1

proposed action," but held that not to be the case there. (*Id*. at p. 765.) In *'Ilio'ulaokalani Coalition v. Rumsfeld* (9th Cir. 2006) 464 F.3d 1083, the Court of Appeals for the Ninth Circuit held a NEPA violation was sufficiently "obvious" where "[t]he Army had independent knowledge of the very issue" raised by the plaintiffs in the lawsuit, i.e., sufficiency of the alternatives considered in the programmatic environmental impact statement (PEIS), despite the fact that the plaintiffs did not submit comments to the Army during the PEIS process. (*Id*. at pp. 1091-1093.) Here, while federal case law interpreting NEPA may be "view[ed] as persuasive authority when interpreting CEQA" (*Western Placer Citizens for an Agricultural and Rural Environment v. County of Placer* (2012) 144 Cal.App.4th 890, 902-903), none of the cases relied upon by petitioners involved a challenge to the adequacy of findings. More persuasive is our decision in *People ex rel. California Regional Water Quality Control Bd. v. Barry* (1987) 194 Cal.App.3d 158, a case also relied upon by petitioners, in which we held the defendant therein failed to exhaust administrative remedies with respect to his "claim that the regional board made inadequate findings" because the error "was correctable by the state board, but [the defendant] never tendered the issue to that board in his petition for review." (*Id*. at pp. 178-179.) Similarly, here, the alleged inadequacies in the CEQA findings were correctable by the Board in the reconsideration petition. Because petitioners did not give the Board the opportunity to correct the claimed error, they did not exhaust administrative remedies with respect to this claim.

This modification does not change the judgment.

The petition for rehearing is denied.


      BUTZ      , Acting P.J.


      MURRAY   , J.


      HOCH     , J.


2

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| BACKCOUNTRY AGAINST DUMPS et al., | |
| Plaintiffs and Appellants, | C072073 |
| v. | (Super. Ct. No. 34201180000787CUWMGDS) |
| STATE WATER RESOURCES CONTROL BOARD, | |
| Defendant and Respondent; | |
| SAN DIEGO GAS & ELECTRIC COMPANY, Real Party in Interest and Respondent. | |

This is an action brought under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).[1] Backcountry Against Dumps, East County Community Action Coalition, and Donna Tisdale (petitioners) challenge whether a water

---

[1] Undesignated statutory references are to the Public Resources Code.

1

quality certification order (Order) issued by the State Water Resources Control Board (Board) under section 401 of the Clean Water Act (CWA) (codified in 33 U.S.C. § 1341(a)(1)) certifying the construction and operation by real party in interest San Diego Gas & Electric Company (SDG&E) of the Sunrise Powerlink Project (Sunrise Powerlink or the Project) would comply with applicable provisions of the CWA, subject to various conditions contained in the Order.[2] Acting as a responsible agency under CEQA, the Board reviewed the Sunrise Powerlink Final Environmental Impact Report/Final Environmental Impact Statement (Final EIR/EIS), which was certified by the California Public Utilities Commission (CPUC), as the lead agency under CEQA, and the federal Bureau of Land Management (BLM), as the lead agency under the National Environmental Policy Act (NEPA). The Board found the mitigation measures contained in the Final EIR/EIS, supplemented by the conditions imposed by the Order, were "adequate to reduce water quality impacts to less than significant levels."

On appeal of the trial court's denial of their petition for writ of mandate, petitioners contend: (1) the Board "violate[d] CEQA when it issued a conclusory, one and one-quarter page Findings that failed to: [(a)] recognize each significant effect of the Project, (b) identify specific mitigation measures for each of those effects or explain why mitigation was infeasible, and (c) reveal the specific bases for the Board's approval"; and (2) the Board "violate[d] its own regulations when it (a) failed to give [petitioners] proper notice of the Order and (b) improperly denied [petitioners'] reconsideration petition as 'untimely' even though it was filed within 20 days after the Board belatedly gave [them]

[2] A fourth petitioner, The Protect Our Communities Foundation (Protect Our Communities), initially joined in this appeal. We dismissed the appeal, as to this appellant only, after the parties executed and filed in this court a stipulation to dismiss the appeal as to Protect Our Communities. (Cal. Rules of Court, rule 8.244(c).)

required notice and 30 days after the Order's approval date published on the Board's website."

We affirm the judgment. As we explain, with respect to the CEQA claim, petitioners failed to exhaust administrative remedies. With respect to the notice claim, the Board concedes it did not timely provide petitioners with notice of the Order and then mistakenly rejected their reconsideration petition as untimely. However, when the Board realized its mistake, it accepted the reconsideration petition, held a hearing, and concluded the petition did not raise any substantial issues appropriate for review. At no point during this process did petitioners challenge the Board's findings as inadequate. Accordingly, the notice claim was rendered moot by the Board's acceptance and review of the reconsideration petition. Nor were petitioners harmed by the Board's admitted mistake in not providing them with timely notice of the challenged Order.[3]

## BACKGROUND

### *Proposed Project and Initial Environmental Review*[4]

In 2005, SDG&E proposed construction of a 150-mile transmission line between Imperial and San Diego Counties (Proposed Project). The Proposed Project "would consist of a new 91-mile, single-circuit 500 kilovolt (kV) overhead electric transmission

---

[3]     SDG&E requests that we take judicial notice of a March 13, 2012, letter from California Independent System Operator to SDG&E, a March 27, 2012, letter from United States Nuclear Regulatory Commission to SDG&E, and two decisions issued by the United States Court of Appeals for the Ninth Circuit. Because the information contained in these materials is unnecessary to resolve the issues on appeal, we deny the request. (See *Maral v. City of Live Oak* (2013) 221 Cal.App.4th 975, 984, fn. 2.)

[4]     In light of the fact petitioners do not challenge the adequacy of the environmental documents underlying the Board's decision to issue the water quality certification order, we decline to provide a detailed summary of these documents. We provide only as much detail as required to give the reader an understanding of the background facts.

line between the existing Imperial Valley Substation (in Imperial County near the City of El Centro) to a proposed new Central East Substation (in central San Diego County, southwest of the intersection of County Highways S22 and S2). Between the proposed new Central East Substation and SDG&E's existing Peñasquitos Substation (in the City of San Diego), SDG&E would construct a new 59-mile 230 kV double-circuit and single-circuit transmission line, portions of which would be underground." The 500 kV portion of the line would travel the length of Anza-Borrego Desert State Park (Anza-Borrego), a distance of about 25 miles. SDG&E filed a right-of-way grant application with BLM and an application for a certificate of public convenience and necessity with CPUC. Thereafter, SDG&E filed an amended application accompanied by a proponent's environmental assessment (PEA) for the Proposed Project.

In January 2008, a draft environmental impact report/environmental impact statement (Draft EIR/EIS) was issued jointly by CPUC and BLM, as lead agencies under CEQA and NEPA, respectively. The Draft EIR/EIS identified three basic objectives of the Proposed Project: "maintain reliability in the delivery of power to the San Diego region"; "reduce the cost of energy in the region"; and "accommodate the delivery of renewable energy to meet State and federal renewable energy goals from geothermal and solar resources in the Imperial Valley and wind and other sources in San Diego County." In more than 7,500 pages, the Draft EIR/EIS discussed the environmental setting and impacts of the Proposed Project and 27 alternatives (i.e., 18 alternative route segments along the Proposed Project route, 4 routes following portions of an existing southwest powerlink, 2 non-wires alternatives, 2 alternatives including components of a Lake Elsinore advanced pumped storage project (LEAPS), and a no project/no action alternative), as well as connected and future foreseeable projects. A 90-day public comment period on the Draft EIR/EIS ended in April 2008. The Board commented on the Draft EIR/EIS with respect to impacts to water quality.

4

In July 2008, CPUC and BLM issued a recirculated draft environmental impact report/supplemental draft environmental impact statement (Recirculated/Supplemental Draft EIR/EIS) to address certain changes to a related wind project in northern Mexico.[5] A 45-day public comment period on the Recirculated/Supplemental Draft EIR/EIS ended in August 2008.

In October 2008, CPUC and BLM issued the Final EIR/EIS, consisting of the Draft EIR/EIS, the Recirculated/Supplemental Draft EIR/EIS, comments received on these documents, and responses to the comments. The Final EIR/EIS totaled over 11,000 pages. Adding to the analysis in the Draft EIR/EIS, the Final EIR/EIS evaluated and compared the environmental impacts of eight transmission and/or generation alternatives. The Final EIR/EIS also included a mitigation monitoring, compliance, and reporting program (Mitigation Monitoring Program) with mitigation measures recommended for the Proposed Project and all alternatives.

In December 2008, CPUC certified the Final EIR/EIS, granted SDG&E's application for a certificate of public convenience and necessity to construct Sunrise Powerlink using one of the alternative routes analyzed in the Final EIR/EIS—the Final Environmentally Superior Southern Route (Final Southern Route)—and adopted the Mitigation Monitoring Program recommended for the Final Southern Route in the Final EIR/EIS. BLM approved the Project the following month. With respect to environmental impact, CPUC's decision explained: "The Final EIR/EIS ranks the [Final

_____

[5]     The Draft EIR/EIS assumed the wind project would generate approximately 250 megawatts (MW) of electricity based on an existing power purchase agreement. However, a subsequent application for a presidential permit (APP) submitted to the United States Department of Energy disclosed the project could generate approximately 1,250 MW of electricity. An addendum to the APP added construction of a new 230 kV transmission line to the project.

Southern Route] fourth among all the alternatives studied . . . . Running a total of 123 miles, this alternative is substantially shorter than the Proposed Project or other Northern Routes and avoids Anza-Borrego. It crosses 19.2 miles of National Forest land but does so within acceptable land use zones and makes use of a Draft Department of Energy Section 368 West-wide Energy Corridor. In addition, the alternative is collocated with the Southwest Powerlink for only 36 miles, in an area of comparatively low fire risk. [¶] The Final EIR/EIS modifies the route proposed in the Draft EIR/EIS to avoid both the Campo and La Posta Reservations. . . . [¶] The [Final Southern Route] also contains modifications to avoid Forest Service land use zones that do not allow transmission lines or new access roads. Commission staff and BLM consulted extensively with the Forest Service and SDG&E to identify route modifications within Cleveland National Forest to minimize impacts to Forest Service resources and avoid incompatible land use zones." (Fns. omitted.)

CPUC's decision further explained: "The Final EIR/EIS concludes that three alternatives—the All-Source Generation Alternative, the In-Area Renewable Alternative, and the LEAPS Transmission-Only Alternative—have fewer significant unmitigable impacts than the [Final Southern Route]. However, we find that [these] alternatives . . . are not feasible when we consider certain other considerations, including meeting California's broader policy goals." One such goal was the achievement of greenhouse gas (GHG) reductions through expanding the state's renewable energy portfolio to 33 percent under the Renewables Portfolio Standard (RPS) in the shortest time with the greatest economic benefits. CPUC explained, "[t]he three top ranked alternatives would not facilitate even half the amount of renewable development that the [Final Southern Route] will facilitate" and this route "will generate more economic benefits to ratepayers than the top ranked alternatives." CPUC concluded: "[T]he [Final Southern Route] will facilitate our policy goal of renewable procurement at 33% RPS levels within a

6

reasonable period of time with the greatest economic benefits at the lowest environmental cost. While the Northern Routes analyzed in the EIR/EIS could achieve these benefits, they would do so at significantly greater environmental expense." CPUC also concluded the Final Southern Route "will also provide unquantifiable benefits, including a more robust southern California transmission system, long-term improvement of California's aging energy infrastructure, and insurance against unexpected high load growth in SDG&E's service area."

In August 2009, Utility Consumers' Action Network and Center for Biological Diversity challenged CPUC's decision under CEQA in a petition for writ of review filed with the California Supreme Court. The petition was summarily denied.

### *Modification of the Project*

Following approval of the Project, SDG&E began implementing the Mitigation Monitoring Program, the final version of which was issued in April 2010, by conducting pre-construction surveys and preparing the final design. Certain modifications to the Project resulted from engineering requirements and from compliance with mitigation measures contained in the Mitigation Monitoring Program, including resource avoidance to minimize or avoid environmental impacts and relocation of project components to accommodate landowner preferences.

In May 2010, SDG&E filed a Project Modification Report (PMR) with CPUC and BLM. The PMR explained: "The modifications described in this PMR are the result of SDG&E's implementation of measures in the [Mitigation Monitoring Program] to avoid and minimize impacts to sensitive resources, reduce or eliminate engineering constraints, and accommodate landowner location preferences where possible. They include changes in the alignment, placement of towers and poles, size and location of temporary work areas, number and size of temporary construction yards, number and length of new access roads, and construction methods (conventional or helicopter)." The modified project

7

spanned a shorter distance (117 miles) than the Project approved by CPUC and BLM and included fewer structures, wire stringing sites, new access roads, and construction yards. The modified project also decreased the size of one of the substations. While the modified project increased the number of tower staging access pads, this was due to an increase in the number of transmission towers that would be built by helicopter to allow for fewer new access roads and less ground disturbance. The modified project also increased the number of reconductoring replacement poles due to upgrades that were approved as part of the Final Southern Route. The PMR concluded the modified project "would reduce but not eliminate significant impacts associated with the [Final Southern Route] and would not result in any new significant impacts."

In September 2010, CPUC determined the proposed modifications did not require supplemental environmental review under CEQA because there were no "new significant impacts or impacts that are more severe than those disclosed in the Final EIR/EIS used to approve the [Final Southern Route]." BLM reached the same conclusion under NEPA.

With respect to impacts to jurisdictional waters, CPUC and BLM explained: "As stated in Section D.2.6 [of the Final EIR/EIS], Jurisdictional Waters and Wetlands, impacts to jurisdictional areas were not clearly defined until a final route was selected that includes project-specific features and final engineering. At that time, a formal delineation was conducted to determine those impacts so that SDG&E could apply for permits from the [appropriate entities, including the Board]. Since a formal delineation had not been conducted at the time of publication of the [Final EIR/EIS], the precise presence and extent of waters and wetlands was unknown. However, the [Final EIR/EIS] considered impacts to [a variety of] vegetation communities that generally occur in jurisdictional areas . . . . [¶] Impacts to jurisdictional waters were considered significant but mitigable for the [Final Southern Route]. Mitigation Measure B-1c, Conduct

8

biological monitoring, and B-2a, Provide restoration/compensation for affected jurisdictional areas, identified in the Final EIR/EIS for this impact would also be required for the modified project and would be adequate to ensure that impacts to jurisdictional waters would still be Class II consistent with the Final EIR/EIS. Overall, permanent impacts to waters of the U.S. were reduced from 14.49 acres with the [Final Southern Route] to 3.77 acres with the modified project. Temporary impacts to waters of the U.S. were reduced from 80.21 acres with the [Final Southern Route] to 11.02 acres with the modified project. Permanent impacts to waters of the State were reduced from 15.39 acres with the [Final Southern Route] to 4.14 acres with the modified project, and temporary impacts were reduced from 82.81 acres with the [Final Southern Route] to 12.01 acres with the modified project."

In March 2011, Center for Biological Diversity and petitioners herein challenged CPUC's decision to forego preparation of a supplemental or subsequent EIR (SEIR) to address the aforementioned modifications in a petition for writ of review, mandamus or other appropriate relief filed with the California Supreme Court. This petition was also summarily denied.

### Water Quality Certification

In October 2009, after the Project was approved and before issuance of the PMR, SDG&E filed an application with the Board for a water quality certification under section 401 of the CWA.[6] The Board forwarded a copy of the application to petitioners, who submitted a comment letter arguing: the Board should delay decision on the certification application until all pending lawsuits are resolved; the application did not

---

[6] Under section 401 of the CWA, any applicant for a federal license or permit to conduct any activity that may result in a discharge into navigable waters must provide the federal licensing agency with a certification from the appropriate authority (in this case, the Board), that the discharge will comply with federal water pollution control statutes.

9

adequately address concerns regarding stormwater runoff and failed to present adequate information regarding proposed permanent pull sites, temporary construction and maintenance pads, and impacts to endangered and threatened species; certain portions of the application were inconsistent with the United States Fish and Wildlife Service's Biological Opinion for the Project; and a map of past and future projects was incomplete. In August 2010, after the PMR was filed with CPUC, SDG&E filed a revised application for the water quality certification with the Board.

In November 2010, after CPUC determined the modifications in the PMR did not require supplemental environmental review under CEQA, the Board issued the Order granting the requested water quality certification, subject to 35 conditions.[7]  The Order

---

[7]  In addition to 3 standard and 11 administrative conditions, the Order imposed the following 21 conditions:

"1.  Construction and operation of the Project shall adhere to all Mitigation Measures . . . found in the [Final EIR/EIS] issued October 17, 2008. . . . Changes to the [Final EIR/EIS] that may affect the [Board's] findings pursuant to CEQA, shall result in additional review, and possible modification, revocation, or denial of certification.

"2.  Construction, operation, documentation and reporting for the Project shall be in compliance with the [Mitigation Monitoring Program], dated April 1, 2010, and any subsequent revisions to the [Mitigation Monitoring Program] that may be prepared in order to correct minor inconsistencies, typographical errors, etc.  SDG&E is responsible for successfully implementing all the adopted mitigation measures in the [Mitigation Monitoring Program].

"3.  . . . [T]he Contact List containing all contact information for all key Project personnel for all Project segments, including all environmental monitors, shall be provided to the [Board].  No work on the Project that may result in a discharge to a water of the State shall be permitted until the Contact List is received by the [Board].  The [Board] shall be provided with any update to this Contact List in a timely manner as personnel changes occur.

10

"4.     . . . [I]f an unplanned construction activity violates, or threatens to violate, water quality standards, SDG&E shall cause work to be stopped in that area immediately (as long as it can be done safely) until the [Board] can be contacted to resolve the potential violation.

"5.     . . . [E]mergency repairs may be required during the construction and maintenance of the Project to address situations that potentially or immediately threaten the integrity of the Project facilities.  For response to emergencies that affect or have the potential to affect waters of the State, all applicable communication protocols and [mitigation measures] shall be followed to the fullest extent practicable.  Once the emergency has abated, any unavoidable environmental damage shall be reported to the Project biological construction monitor, who shall notify the [Board] within 24 hours.  If required by the [Board], SDG&E shall develop an emergency response plan following cessation of the emergency in order to mitigate for any significant water quality effects caused by the emergency response consistent with all applicable MMs and any permits issued for the Project.

"6.     . . . [A] General Permit for Storm Water Discharges Associated with Construction Activity (NPDES permit) authorization . . . shall be obtained.  No work on the Project that may result in a discharge to a water of the State shall be permitted until this authorization is obtained.  SDG&E shall establish and implement a Stormwater Pollution Prevention Plan or plans (SWPPP), to minimize the hydrologic impacts of Project.  Construction of the Project shall be conducted in compliance with all SWPPPs submitted by SDG&E for the Project.

"7.     Compensatory mitigation for effects due to the construction and operation of the Project . . . shall be guided by, documented, and reported in compliance with Final Project Habitat Mitigation and Monitoring Plans (HMMPs) to be approved by the [Board] and other relevant state and federal agencies.  State and federal regulations require mitigation for impacts to waters of the State, including waters of the U.S.  The Final HMMP will describe how the mitigation will be accomplished, including preservation, restoration and enhancement activities, monitoring and performance criteria, and management of compensatory mitigation areas.

"Pending approval of the Final HMMPs, the Conceptual HMMP revised October 2010, including all attachments and appendices, shall be accepted as a provisional HMMP for the Project, in consideration of the complexity of the ongoing transactions and planning associated with the proposed compensatory mitigation properties. Substantial changes to the Conceptual HMMP's provisions may result in additional review period, and modification, suspension, or denial of certification.

11

"All details for the Final HMMPs, except those specified in Condition 8 below, shall be submitted to the [Board] within 120 days of the issuance of this Certification unless an extension is requested by SDG&E and granted by the [Board] before the 120 days have expired.  Failure to meet this deadline may result in revocation of this Certification. . . .

"8.      Property and interests in real property obtained for compensatory mitigation shall be subject to approval by the [Board].  Management plans, as presented in the HMMPs for each parcel proposed as compensatory mitigation, will be subject to approval by the [Board].  These plans will, at a minimum, provide detailed information of the following:

"a.      Mitigation objectives, including a summary of the aquatic resource type, and acreage and/or stream reach length to be provided, the method of compensation (i.e., restoration, establishment, enhancement, and/or preservation), and the manner in which the project will properly function within a watershed to offset permitted impacts to waters of the State.

"b.      Compensation Plan's scope of work.

"c.      Method(s) of site protection through legal and real estate arrangements and instruments.

"d.      Access to all mitigation sites for vector control purposes, if deemed necessary by the appropriate vector control agency, and for on-going maintenance and mitigation compliance review by authorized staff of any regulatory agencies.

"e.      Complete baseline information of all sites, including a full description of the sites' resources and ecological conditions, contributions to water quality and a description of how unavoidable impacts are offset by the acquisition and management of the sites.

"f.      Performance standards, including documentation of the sites' maintenance and improvement of ecological and hydrologic functions.

"g.      Plans for maintenance and long-term management, including a schedule and work plan of sufficient detail to ensure that all actions needed for accomplishment of site management goals are planned and implemented.

12

"h.     A site monitoring plan of sufficient detail and duration to provide a record of the condition of the sites over time.  The monitoring plan will account for all personnel, equipment and actions needed to observe, document and report in perpetuity all site characteristics which are intended to provide compensation for ecological and hydrological services lost due to Project construction and operation.  The monitoring plan will specify the level and frequency of monitoring to be conducted at the sites.  The monitoring plan will include an adaptive management element to provide for orderly management response to problems and changing conditions.

"i.     Budget projections to ensure that site endowments are sufficient to provide for all necessary expenses entailed in the implementation of the plan.

"j.     Specification, in detail, of all financial assurances proposed to ensure implementation of all of the plans' elements in perpetuity.

"k.     Any additional information deemed necessary by the [Board] or other relevant state or federal Agency.

"The Final HMMPs shall be submitted to the [Board] within 12 months of the issuance of this Certification unless an extension is requested by the SDG&E and granted by the [Board] before the 12 months have expired.  Failure to meet this deadline may result in revocation of this Certification. . . .

"Full title and ownership or land transfer agreements for all compensatory mitigation properties shall be finalized before energization of Sunrise Powerlink Transmission Line, unless an extension is requested by the SDG&E and granted by the [Board]. . . .

"9.     Compensation for Permanent and Temporary Impacts:  The compensatory mitigation ratio for permanent and temporary impacts to waters of the State shall be as shown in Tables 1 and 2 below.  [Tables omitted.]  Exact mitigation ratios achieved under the Final HMMPs may vary slightly, but shall not be substantially lower than those presented in this Certification.  Details for compliance with this condition shall be specified in the Final HMMPs as described in Conditions 7 and 8.  [¶] . . . [¶]

"10.     [A]ny impacts associated with unauthorized activity (e.g., exceeding approved construction footprints into a wetland) shall be mitigated at a 5:1 ratio (all ratios are expressed as mitigation:  impact), except in Flat-Tailed Horned Lizard Management Areas (FTHL MA) where a ratio of 5.5:1 shall apply.  Restoration of the unauthorized impacts shall be credited at a 1:1 ratio (i.e., mitigated by in-place habitat restoration); the

13

remaining 4:1 (or 4.5:1 in FTHL MA) shall be acquired off-site as restoration or enhancement mitigation sites.  If, preservation sites are offered as off-site compensatory mitigation for unauthorized activity, the minimum acceptable ratio shall be 11:1.  Details for compliance with this Condition shall be specified in the final HMMP as described in Conditions 7 and 8.

"11.    Parcels proposed for compensatory mitigation through preservation must meet the criteria found in the Code of Federal Regulations, title 33, section 332.3(h).

"12.    Where on-site restoration of vegetation and landforms are planned, SDG&E shall identify a qualified Habitat Restoration Specialist who shall prepare a Habitat Restoration Plan . . . .  The Habitat Restoration Plan shall be subject to approval by the [Board].  SDG&E shall be responsible for the implementation of the Habitat Restoration Plan.

"13.    Construction and operation of Project shall comport with the '2009/2010 Weed Control Plan for the Environmentally Superior Southern Route of the SDG&E Sunrise Powerlink Project' as prepared by RECON Environmental, dated September 2, 2009 . . . .

"14.    All construction, maintenance, and removal of roads shall be conducted in a manner tha[t] avoids and minimizes road-related erosion and hydromodification.  At a minimum, road construction and maintenance for the Project shall be conducted in accordance with [various specified documents].

"Road construction, maintenance, or removal specifications that may be conditions of the U.S. Forest Service Special Use Permit or the [BLM] Right of Way Grant shall super[s]ede documents cited above in condition 14.

"Any specifications found in the documents cited above in condition 14 which may be at variance with the mitigation measures specified in the [Final EIR/EIS] or the conditions of this Certification Order shall be superseded by those mitigation measures or conditions.

"15.    Through-cut roads can be a significant source of discharge of fill into streams and wetlands.  (Through-cut roads are roads of any gradient, with or without sideboard ditches on one or both sides, with a running surface that is lower than the surrounding terrain on both sides of the road.) . . . Drainage for through-cut roads shall be as specified for water bars for all roads in the *Sunrise Basis of Design Road Report* . . . . When a need is encountered for construction or maintenance of new or existing through-

14

certified that "as long as all of the conditions listed in this Certification or incorporated by reference are met, any discharge from the Project will comply with the applicable

cut roads of any gradient that are not described in [that report], the [Board] shall be notified of the circumstance and provided with a description of the site and the provisions for drainage of the site for approval.

"16.    To avoid potential adverse effects to watershed functions by the Project's temporary and permanent access roads, structure pads and other facilities, . . . historic runoff patterns shall be maintained where possible.

"17.    Appropriate soil erosion prevention and control Best Management Practices [(BMPs)] shall be implemented throughout the construction and maintenance of the Project. Erosion control BMPs shall be implemented to the minimum standards presented in the *SDG&E Water Quality Construction Best Management Practices Manual.*

"18.    The discharge of petroleum products or other pollutants to surface waters that may result in violation of water quality standards is prohibited. Activities shall not cause visible oil, grease, or foam in the work area or downstream.

"19.    Fueling, lubrication, maintenance, storage, and staging of vehicles and equipment shall not occur in or within 200 feet of any waters of the State or any area that could affect a water of the State. Fueling, lubrication, maintenance, storage, and staging of vehicles, and equipment shall not result in a discharge or a threatened discharge to any waters of the State.

"20.    Variances for minor changes to the approved Project plans issued according to the procedures specified in the [Mitigation Monitoring Program] shall be recognized by this Certification Order as part of the Project. Mitigation for impacts to waters of the State that may occur as a result of approved variances shall be provided according to the [Mitigation Monitoring Program], HMP, and all conditions of this Certification Order. Accounting of any additional or new permanent or temporary impacts to waters of the State which may have occurred as a result of approved variances shall be provided at the end of construction so that appropriate mitigation can be obtained and documented.

"21.    Reporting -- Notifications and reports shall be directed to:  Program Manager, Certification and Wetlands Program at the . . . State and appropriate Regional Water Board offices."

15

provisions of [CWA] sections 301 (Effluent Limitations), 302 (Water Quality Related Effluent Limitations), 303 (Water Quality Standards and Implementation Plans), 306 (National Standards of Performance), and 307 (Toxic and Pretreatment Effluent Standards)." The Order also explained the certification would "serve as Waste Discharge Requirements pursuant to the Porter-Cologne Water Quality Control Act."

In an attachment to the Order, the Board "determined that different or additional mitigation measures would not substantially lessen or avoid any significant effect of the Project on water quality" and the "mitigation measures for significant and potentially significant water quality impacts in the [Final EIR/EIS], supplemented with the provisions in the [Order], are adequate to reduce water quality impacts to less than significant levels."

The Board also made the following findings: "On December 18, 2008, the [CPUC], as lead agency, certified the [Final EIR/EIS] for the Project in accordance with [CEQA]. The [Board], as a responsible agency, consulted with the CPUC, reviewed and submitted comments on the draft environmental document, and designated appropriate staff to attend meetings and coordinate with the CPUC. In making its determinations and findings, the [Board] must presume that the [Final EIR/EIS] comports with the requirements of CEQA and is valid. [Citation.] As such, the [Board] has reviewed and considered the environmental documents and all proposed mitigation measures. [¶] . . . [¶] The [Project] will cause permanent impact to waters of the State by filling one wetland area, building numerous access roads which cross streams, and by constructing numerous tower pads in or immediately adjacent to streams. The Project will also cause temporary impacts to waters of the State by the installation of numerous temporary construction areas, temporary fly yards, and temporary access road crossings of streams. Potential temporary impacts from construction activities, such as spills and leaks, could also occur. [¶] Avoidance and minimization mitigation measures for significant and

16

potentially significant water quality impacts that will or could arise as a result of these activities include development of a Construction Stormwater Pollution Prevention Plan (SWPPP) with accidental spill control procedures, establishment of an environmental training program, adoption of BMPs for prevention and control of erosion, and development of a Habitat Mitigation and Monitoring Plan.  Avoidance and minimization measures also include Project routing adjustments to minimize or eliminate numerous stream crossings.  [¶]  Compensatory mitigation for significant and potentially significant water quality impacts includes the acquisition of four properties and funding for transfer of ownership of existing State lands to Anza Borrego State Park for preservation as park land designated for protection of wildlife habitats (the primary beneficial use affected by project impacts to dry washes).  Funding for management of all sites in perpetuity is also provided for all mitigation sites, as specified in site-specific Habitat Management Plans for all compensatory mitigation sites that are to be developed."

## *Petition for Reconsideration*

The challenged Order was signed on November 9, 2010.  The following day, David Hogan, staff biologist with Protect Our Communities, sent an e-mail to Clifford Harvey, the Board's environmental scientist and staff contact for the Sunrise Powerlink certification process, asking about the status of SDG&E's application for water quality certification.  Harvey responded the same day and advised Hogan that "the technically conditioned 401 certification for the Sunrise Project has been signed" and would be distributed "to the applicant, other interested regulatory agencies and for public release . . . early next week."  As promised, on November 15, 2010, the Board sent the Order to SDG&E and to various interested entities, but did not send the Order to petitioners.  On November 30, 2010, in another e-mail, Harvey advised Hogan the Order was posted on the Board's Website.  On December 20, 2010, petitioners submitted a petition for reconsideration with the Board, which was rejected as untimely because it was submitted

17

more than 30 days after the challenged Order was signed. (See Cal. Code Regs., tit. 23, § 3867, subd. (c).)

The Board filed a notice of determination on January 11, 2011, which was revised January 13, 2011. Petitioners responded on February 7, 2011, by filing the present CEQA action with the trial court. Thereafter, on March 28, 2011, the Board rescinded the previous rejection of the reconsideration petition. In a letter to petitioners' attorney, the Board's assistant chief counsel explained: "I believed that the [Board] had sent notice of the certification action to all interested parties within three days of the certification action, as required by California Code of Regulations, title 23, section 3859, subdivision (a). You subsequently filed a [CEQA action], in which you alleged that the [Board] had failed to send notice of the certification action to interested parties. As I was unaware of any failure to send notice of the certification action when I rejected the petition for reconsideration, I have reconsidered the timeliness issue and have concluded that I will tentatively treat the petition for reconsideration as having been timely submitted."

The reconsideration petition challenged the Order under the California Code of Regulations, title 23, section 3856(f), which states that "the certifying agency shall be provided with and have ample time to properly review a final copy of valid CEQA documentation before taking a certification action." Petitioners argued, "the [Final EIR/EIS] is inadequate under CEQA and does not constitute a valid CEQA document on which the Board may rely. Not only does the [Final EIR/EIS] fail to comply with CEQA with respect to [Sunrise Powerlink] as it was defined in the [Final EIR/EIS], it fails to describe and analyze the environmental impacts of the project in its current form, after its transformation by the PMR." Petitioners continued: "CEQA requires agencies to prepare an SEIR if 'substantial changes are proposed in the project' or 'substantial changes occur with respect to the circumstances under which the project is being

18

undertaken' and either of these 'will require major revisions in the environmental impact report.' [Citations.] An SEIR is also required where new information that could not have been previously known subsequently becomes available. [Citation.] The modified Project involves a multitude of significant new changes, circumstances, and information, thus requiring an SEIR." Thus, argued petitioners, "the Board's Order providing water quality certification for [Sunrise Powerlink] was improper and should be rescinded" because "the Board was not provided with a *valid* CEQA document, let alone given ample time to properly review it."

In September 2011, the Board sent petitioners a draft order on the reconsideration petition which, when approved, would dismiss the petition "for failure to raise any substantial issue appropriate for review." The draft order stated petitioners' contention to be "that the Executive Director's issuance of the water quality certification was in error[] because it was done [in] reliance [on] a flawed, insufficient environmental impact report and that the [Board] should have required the [CPUC] to prepare [an SEIR] due to modifications made to the Project's route and methods by which the Project will be constructed." The draft order then explained: "The CPUC's [Final EIR/EIS] contained over 120 mitigation measures, many of which required avoidance and minimization of environmental effects. After the [Final EIR/EIS's] adoption, SDG&E completed the engineering and design of the Project. In compliance with the [Final EIR/EIS's] mitigation measures, the Project's route and construction methods were altered in order to avoid or minimize environmental impacts. SDG&E submitted these changes to the CPUC in a [PMR] on May 14, 2010. Though not required, the CPUC publicly noticed and accepted comments on the PMR. The CPUC published its final analysis of the PMR in a Project Modifications Report Memorandum (Memorandum) in September 2010. The Memorandum analyzed each modification, both collectively and individually, and concluded that no supplemental environmental review was necessary. [¶] The Division

19

of Water Quality staff reviewed and considered the [Final EIR/EIS], the PMR, and the Memorandum along with numerous other documents when it drafted the water quality certification and recommended it be signed by the Executive Officer. In response to the petition for reconsideration, the Office of Chief Counsel and Division of Water Quality have again reviewed the administrative record in this matter, along with the Petitioners' allegations and SDG&E's response to the petition. The [Board] has complete discretion to determine whether a petition raises substantial issues that are appropriate for review, and to dismiss petitions that fail to raise such issues. We have concluded that the petition for reconsideration does not raise any substantial issues appropriate for review." (Fn. omitted.)

In response, petitioners submitted comments accusing the Board of "a long list of dismissive and disingenuous actions apparently intended to stifle [their] ability to voice their concerns about the [Project]," including the failure to send the water quality certification to petitioners and the initial rejection of the reconsideration petition as untimely. With respect to the Board's conclusion that the petition failed to raise any substantial issues appropriate for review, petitioners argued: "[T]he Board was not provided with a *valid* CEQA document because the Project was substantially and repeatedly modified after its [Final EIR/EIS] was prepared. The lack of a valid CEQA document is a substantial issue warranting the Board's review. [¶] The importance of the Board's proper CEQA review is underscored by the significant environmental impacts that the Project will have. As the Board's own CEQA Findings for the [Project] admit, the Project would have numerous substantial, permanent impacts on water resources: [¶] [']The [Project] will cause permanent impact to waters of the State by filling one wetland area, building numerous access roads which cross streams, and by constructing numerous tower pads in or immediately adjacent to streams. The Project will also cause temporary impacts to waters of the State by the installation of numerous temporary construction

20

areas, temporary fly yards, and temporary access road crossings of streams. Potential temporary impacts from construction activities, such as spills and leaks, could also occur.['] [¶] The Project's significant environmental degradation, the [Final EIR/EIS's] notable errors and omissions, and the Board's consequent failure to adequately address and mitigate the Project's impacts, present substantial issues appropriate for the Board's review."

On October 4, 2011, the Board held a hearing on the reconsideration petition. At no point during the hearing did counsel for petitioners argue the Board's CEQA findings were inadequate. The Board adopted the order dismissing the petition for reconsideration.

### CEQA Action

As previously stated, petitioners filed this CEQA action in the trial court on February 7, 2011. The operative first amended petition for writ of mandate and complaint for declaratory and injunctive relief asserted two causes of action. In the first, petitioners sought to set aside the Board's decision to reject their reconsideration petition as untimely. In the second, petitioners sought to set aside the Order issuing the water quality certification, alleging: (1) "the [Final EIR/EIS] is gravely inadequate because it lacks biological and hydrological surveys and other environmental information necessary to accurately evaluate and mitigate the Project's impacts"; (2) CPUC "must prepare [an SEIR]" because "substantial new information has become available and substantial changes in the Project and the circumstances surrounding it have occurred since the [Final EIR/EIS] was certified and CPUC approved the Project"; and (3) "[t]he Board's CEQA findings for the [Project] are inadequate. The Board fails to identify and issue a *separate* finding for *each* significant effect of the Project, as required. Instead, in its paltry one-and-a-quarter page findings, the Board cursorily lists some of the Project's water-related impacts and then, in a separate paragraph, lists some of the mitigation

21

measures that would be used to reduce or avoid the impacts. Further, the Board does not specify which measures are intended to mitigate which impacts, or how they would do so." Petitioners' allegations concerning the adequacy of the Final EIR/EIS and CPUC's failure to prepare an SEIR for the Project are not relevant to the contentions raised on appeal and will not be further discussed.

The matter was heard on July 6, 2012. After entertaining oral argument, the trial court took the matter under submission. On July 26, 2012, the trial court denied the petition. The trial court concluded petitioners' first cause of action was moot because, after petitioners filed the present petition seeking a writ of mandate directing the Board to decide the reconsideration petition, the Board acknowledged it erroneously rejected this petition as untimely, held a hearing, and rendered a decision. With respect to the second cause of action, the trial court concluded petitioners' claim that the Board's CEQA findings were inadequate was "barred due to [their] failure to exhaust administrative remedies," explaining: "Petitioners failed to challenge the adequacy of the [Board's] findings at the administrative level, despite having several opportunities to do so."

DISCUSSION

I

### *Failure to Exhaust Administrative Remedies*

Petitioners contend the Board "violate[d] CEQA when it issued a conclusory, one and one-quarter page Findings that failed to: [(a)] recognize each significant effect of the Project, (b) identify specific mitigation measures for each of those effects or explain why mitigation was infeasible, and (c) reveal the specific bases for the Board's approval." We conclude petitioners failed to exhaust their administrative remedies with respect to this claim.

## A.

### *The Exhaustion Doctrine*

"Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action." (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1199; see § 21177.) " 'In brief, the rule is that where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act.' [Citation.] The rule is a jurisdictional prerequisite in the sense that it 'is not a matter of judicial discretion, but is a fundamental rule of procedure laid down by courts of last resort, followed under the doctrine of *stare decisis*, and binding upon all courts.' [Citations.]" (*Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 874.) Section 21177 codifies the doctrine for CEQA. Subdivision (a) of this section provides: "No action or proceeding may be brought pursuant to Section 21167 unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person during the public comment period provided by this division or prior to the close of the public hearing on the project before the issuance of the notice of determination." (§ 21177, subd. (a).) Thus, "the issues raised before a court must first have been raised during the administrative process, although not necessarily by the person who subsequently seeks judicial review." (*Citizens for Open Government v. City of Lodi*, *supra*, 144 Cal.App.4th at p. 875.)

Section 21177, subdivision (b), also provides: "No person shall maintain an action or proceeding unless that person objected to the approval of the project orally or in writing during the public comment period provided by this division or prior to the close of the public hearing on the project before the filing of the notice of determination." Thus, "the availability of judicial review is restricted to parties who have objected to the agency's approval of the project." (*Citizens for Open Government v. City of Lodi*, *supra*,

144 Cal.App.4th at p. 875.)  Here, there is no dispute that petitioners objected to the Board's issuance of the Order granting the water quality certification.  The question is whether they, or anyone else, raised the adequacy of the Board's CEQA findings as an issue at the administrative level.

"The rationale for exhaustion is that the agency ' "is entitled to learn the contentions of interested parties before litigation is instituted.  If [plaintiffs] have previously sought administrative relief . . . the [agency] will have had its opportunity to act and to render litigation unnecessary, if it had chosen to do so." ' [Citation.]" (*Mani Brothers Real Estate Group v. City of Los Angeles* (2007) 153 Cal.App.4th 1385, 1394-1395.)  The doctrine also serves " ' "to lighten the burden of overworked courts in cases where administrative remedies are available and are as likely as the judicial remedy to provide the wanted relief." [Citation.]  Even where the administrative remedy may not resolve all issues or provide the precise relief requested by a plaintiff, the exhaustion doctrine is still viewed with favor "because it facilitates the development of a complete record that draws on administrative expertise and promotes judicial efficiency." [Citation.]  It can serve as a preliminary administrative sifting process [citation], unearthing the relevant evidence and providing a record which the court may review. [Citation.]' [Citation.]" (*Sierra Club v. San Joaquin Local Agency Formation Com.* (1999) 21 Cal.4th 489, 501.)

"The 'exact issue' must have been presented to the administrative agency to satisfy the exhaustion requirement.  [Citation.]  However, 'less specificity is required to preserve an issue for appeal in an administrative proceeding than in a judicial proceeding' because, although not the case here, parties in such proceedings generally are not represented by counsel.  [Citation.]" (*Mani Brothers Real Estate Group v. City of Los Angeles, supra,* 153 Cal.App.4th at pp. 1394-1395.)  Nevertheless, "comments must be 'sufficiently specific so as to allow the [a]gency the opportunity to evaluate and respond

24

to them.' [Citation.]" (*North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 631.)

" 'The petitioner bears the burden of demonstrating that the issues raised in the judicial proceeding were first raised at the administrative level. [Citation.]' [Citation.] An appellate court employs a de novo standard of review when determining whether the exhaustion of administrative remedies doctrine applies. [Citation.]" (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 535-536.)

### B.

### *Analysis*

Petitioners have not met their burden. "Consideration of whether . . . exhaustion has occurred in a given case will depend upon the procedures applicable to the public agency in question." (*City of Sacramento v. State Water Resources Control Bd.* (1992) 2 Cal.App.4th 960, 969.) Here, the Board acted as a "Responsible agency" in approving the Sunrise Powerlink (see § 21069), and was obligated to consider the Final EIR/EIS certified by CPUC, the "Lead agency" under CEQA (see § 21067), before doing so. (§ 21061 ["environmental impact report . . . shall be considered by every public agency prior to its approval or disapproval of a project"]; Cal. Code Regs., tit. 14, § 15096, subd. (a) ["responsible agency complies with CEQA by considering the EIR or negative declaration prepared by the lead agency and by reaching its own conclusions on whether and how to approve the project involved"].)

The Board's approval came in the form of the Order issuing the water quality certification. As previously stated, the Board forwarded a copy of SDG&E's application for the certification to petitioners, who submitted a comment letter in response. Obviously, petitioners' comment on SDG&E's application did not challenge the adequacy of the Board's CEQA findings, as the Board had not yet made any findings.

25

When the Board issued the water quality certification, with attached CEQA findings, petitioners filed a petition for reconsideration. (See Cal. Code Regs., tit. 23, § 3867.) The reconsideration petition challenged the Order under the California Code of Regulations, title 23, section 3856, subdivision (f), which states that "the certifying agency shall be provided with and have ample time to properly review a final copy of valid CEQA documentation before taking a certification action." Petitioners argued, "the [Final EIR/EIS] is inadequate under CEQA and does not constitute a valid CEQA document on which the Board may rely. Not only does the [Final EIR/EIS] fail to comply with CEQA with respect to [Sunrise Powerlink] as it was defined in the [Final EIR/EIS], it fails to describe and analyze the environmental impacts of the project in its current form, after its transformation by the PMR." Petitioners continued: "CEQA requires agencies to prepare an SEIR if 'substantial changes are proposed in the project' or 'substantial changes occur with respect to the circumstances under which the project is being undertaken' and either of these 'will require major revisions in the environmental impact report.' [Citations.] An SEIR is also required where new information that could not have been previously known subsequently becomes available. [Citation.] The modified Project involves a multitude of significant new changes, circumstances, and information, thus requiring an SEIR." Thus, argued petitioners, "the Board's Order providing water quality certification for [Sunrise Powerlink] was improper and should be rescinded" because "the Board was not provided with a *valid* CEQA document, let alone given ample time to properly review it."

Even giving this argument a generous interpretation (see *Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 910), the reconsideration petition does not raise a challenge to the adequacy of the Board's CEQA findings " 'so as to allow the [Board] the opportunity to evaluate and respond to [such a challenge.]' " (*North Coast Rivers Alliance v. Marin Municipal Water*

26

*Dist. Bd. of Directors*, *supra*, 216 Cal.App.4th at p. 631.) Instead, it challenges the adequacy of the Final EIR/EIS, the failure of CPUC to prepare an SEIR following modification of the Project, and the concomitant failure of the Board to review such an SEIR before issuing its Order. Nor was an argument challenging the adequacy of the Board's CEQA findings made at the hearing on the reconsideration petition. Moreover, while this issue need not have been raised by petitioners if sufficiently raised by someone else (§ 21177, subd. (a)), petitioners do not argue on appeal that someone else raised the issue of the adequacy of the Board's CEQA findings at the administrative level. We must therefore conclude petitioners failed to exhaust their administrative remedies with respect to this claim.

Nevertheless, petitioners argue that because the California Code of Regulations provides that "[a]n aggrieved person *may* petition the [Board] to reconsider an action" (Cal. Code Regs., tit. 23, § 3867, subd. (a), italics added), the reconsideration petition was not required prior to filing the CEQA action. In support of this argument, petitioners cite *Sierra Club v. San Joaquin Local Agency Formation Com.*, *supra*, 21 Cal.4th 489, which held: "We hereby overrule [*Alexander v. State Personnel Board.* (1943) 22 Cal.2d 198], and hold that, subject to limitations imposed by statute, the right to petition for judicial review of a final decision of an administrative agency is not necessarily affected by the party's failure to file a request for reconsideration or rehearing before that agency." (*Id*. at p. 510.) However, the decision states immediately thereafter "this conclusion does not mean the failure to request reconsideration or rehearing may never serve as a bar to judicial review. Such a petition remains necessary, for example, to introduce evidence or legal arguments before the administrative body that were not brought to its attention as part of the original decisionmaking process. . . . Likewise, a rehearing petition is necessary to call to the agency's attention errors or omissions of fact or law in the administrative decision itself that were not previously addressed in the

27

briefing, in order to give the agency the opportunity to correct its own mistakes before these errors or omissions are presented to a court." (*Ibid*.)

Here, petitioners *did* file a petition for reconsideration, but *did not* call to the Board's attention the adequacy of the CEQA findings in order to give the Board the opportunity to correct the purported inadequacies. Thus, reconsideration was not requested as to that issue. We need not decide whether the above-quoted limitation on the court's holding in *Sierra Club v. San Joaquin Local Agency Formation Com.*, *supra*, 21 Cal.4th 489, is itself a holding or merely dictum (see *People v. Ranscht* (2009) 173 Cal.App.4th 1369, 1376 (dis. opn. of Benke, J.) [disagreeing with majority's conclusion that an express limitation placed by our Supreme Court on a prior holding was dictum]) because, "[e]ven if properly characterized as dictum, statements of the Supreme Court should be considered persuasive." (*United Steelworkers of America v. Board of Education* (1984) 162 Cal.App.3d 823, 835; *Hubbard v. Superior Court* (1997) 66 Cal.App.4th 1163, 1169.) The court's statement regarding the need to call to the agency's attention errors or omissions in an administrative decision before challenging that decision in the courts was not "inadvertent, ill-considered or a matter lightly to be disregarded." (*Jaramillo v. State of California* (1978) 81 Cal.App.3d 968, 971.)[8]

---

[8] Petitioners also argue: "Although a plaintiff may not raise in court new facts that were not presented to the agency for its review, there were no new facts in this case. At issue were the agency's *own* findings of fact, with which we can presume the Board was fully conversant. Whether the agency's findings fulfilled CEQA's mandate is a question of law—one with which we can presume the agency is also fully conversant." To the extent this qualifies as an argument, it may be disregarded as unsupported by any citation to authority. (See *Cassidy v. California Board of Accountancy* (2013) 220 Cal.App.4th 620, 628.) In any event, assuming petitioners' assertions are correct, they fail to explain why a new question of law may be raised in the trial court without first raising the question with the Board.

28

Nor are we persuaded by petitioners' reliance on *People ex rel. California Regional Water Quality Control Bd. v. Barry* (1987) 194 Cal.App.3d 158.  Indeed, in that case we held the defendant failed to exhaust administrative remedies with respect to his "claim that the regional board made inadequate findings" because the error "was correctable by the state board, but [the defendant] never tendered the issue to that board in his petition for review."  (*Id*. at pp. 178-179.)  Here, the alleged inadequacies in the CEQA findings were correctable by the Board in the reconsideration petition.  Because petitioners did not give the Board the opportunity to correct the claimed error, they did not exhaust administrative remedies with respect to this claim.

Petitioners further argue that "since the Board asserts 'complete discretion to determine whether a petition raises substantial issues that are appropriate for review,' and can simply decline to reconsider its decisions by claiming a lack of substantial issues, the Board's reconsideration process [is] an inadequate remedy, and need not be exhausted."  In support of this argument, petitioners cite *Endler v. Schutzbank* (1968) 68 Cal.2d 162 (*Endler*), *Action Apartment Assn. v. Santa Monica Rent Control Bd.* (2001) 94 Cal.App.4th 587, and *Ogo Associates v. City of Torrance* (1974) 37 Cal.App.3d 830.  These cases are readily distinguishable.

In *Endler*, *supra*, 68 Cal.2d 162, the plaintiff alleged the commissioner of corporations labeled him "a criminal on the basis of unproved accusations" and "threaten[ed] disciplinary action against anyone who might employ him."  (*Id*. at p. 165.)  Our Supreme Court held the trial court erred in dismissing the plaintiff's complaint.  (*Ibid*.)  Rejecting the Attorney General's argument that the plaintiff failed to exhaust administrative remedies, the court explained the commissioner offered the plaintiff "a manifestly defective 'hearing' . . . that would bind the commissioner only at his discretion.  Thus, if the hearing confirmed the commissioner's suspicions, he would continue to induce brokers not to hire the plaintiff; if the hearing vindicated the plaintiff's

29

claims of innocence, the commissioner reserved the right to disregard it and to proceed as though the plaintiff had been found guilty. However we might view the niceties of the exhaustion of remedies doctrine, we cannot reconcile the Fourteenth Amendment's requirement of due process with this sort of heads-I-win, tails-you-lose procedure." (*Id.* at p. 168.) Here, petitioners do not argue the reconsideration procedure employed by the Board violated their right to due process. After ultimately accepting the petition for reconsideration, the Board gave all interested parties a noticed opportunity to appear and to present written and oral comments pertinent to the issues raised in the petition. The fact the Board is provided with discretion to "refuse to reconsider the action or failure to act of the executive director . . . if the petition fails to raise substantial issues that are appropriate for reconsideration" (Cal. Code Regs., tit. 23, § 3869, subd. (a)(1)) does not make the Board's reconsideration procedure analogous to the "heads-I-win, tails-you-lose procedure" at issue in *Endler*.

In *Action Apartment Assn. v. Santa Monica Rent Control Bd.*, *supra*, 94 Cal.App.4th 587, the Court of Appeal held a group of landlords could challenge a local regulation requiring them to pay tenants an interest rate of 3 percent per year on security deposits—more than the rate being paid by the financial institutions holding the deposits—without first seeking administrative relief through the general or individual rent adjustment process because "general and individual rent adjustments do not offer an available or adequate remedy" for the claimed unconstitutional taking of property. (*Id.* at pp. 594, 610-612.) Here, a petition for reconsideration does offer petitioners an available and adequate remedy: "Following examination of the petition and any necessary portion of the record, the [Board] may," among other things, "set aside or modify, if possible, the previous action or take new appropriate action." (Cal. Code Regs., tit. 23, § 3869, subd. (a)(3).) The fact the Board concluded petitioners "fail[ed] to raise substantial

30

issues that are appropriate for reconsideration" (*id*., subd. (a)(1)) does not mean the reconsideration procedure does not offer an adequate remedy.

In *Ogo Associates v. City of Torrance*, *supra*, 37 Cal.App.3d 830, the Court of Appeal held property developers could seek a writ of mandate compelling the City to issue a permit to build an apartment project without first applying for a variance from a zoning ordinance that prevented the project from going forward. The court explained the failure to apply for the variance fell within an exception to the exhaustion doctrine, i.e., "when the aggrieved party can positively state what the administrative agency's decision in his [or her] particular case would be." (*Id*. at p. 834.) Citing "overwhelming" evidence that "the city council rezoned the . . . area because appellants planned to build their project there," the court explained, "it is inconceivable the city council would grant a variance for the very project whose prospective existence brought about the enactment of rezoning." (*Ibid*.) Here, petitioners cannot positively state what the Board's decision would have been had they raised the issue advanced in the trial court and on appeal. The Board's decision—characterized by petitioners as a "perfunctory dismissal"—was necessarily limited to the issues raised in the reconsideration petition. Had petitioners challenged the CEQA findings as inadequate, the Board may well have modified the Order to include more detailed findings.

Finally, petitioners argue they were not required to exhaust administrative remedies because the Board lost jurisdiction to reconsider the challenged Order after it initially rejected the petition for reconsideration as untimely and then filed the notice of determination. The Board and SDG&E assert this argument should be rejected because it was not raised in the trial court. (See *Sea & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 417 [" 'issues not raised in the trial court cannot be raised for the first time on appeal' "].) However, while the argument was not advanced in petitioners' opening or reply trial briefs, petitioners' counsel stated during oral argument

31

on the writ petition: "Once petitioners brought this matter within the proper jurisdiction of this Court, the [Board] lost its jurisdiction to render any meaningful relief." We need not decide whether this statement preserved the argument petitioners now make on appeal because, even assuming the Board lost jurisdiction to reconsider the Order when it initially rejected the reconsideration petition as untimely and filed the notice of determination, the Board had jurisdiction over the matter when the reconsideration petition was submitted and nowhere in that petition did petitioners challenge the Board's CEQA findings as inadequate. Nor can petitioners legitimately claim they would have raised this issue had the Board not erroneously rejected the petition as untimely because, when the Board did accept the reconsideration petition and hold a hearing—whether or not it had jurisdiction to do so—petitioners still did not raise the findings issue. Thus, the admitted error the Board made in initially rejecting the reconsideration petition as untimely, even assuming the error resulted in a loss of jurisdiction, does not excuse petitioners from raising the issue of the adequacy of the Board's CEQA findings in their reconsideration petition.[9]

---

[9]    We also reject petitioners' argument, raised for the first time in their reply brief, that they fall within an exception to the exhaustion requirement found in section 21177, subdivision (e). " '[P]oints raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before. [Citations.]' [Citations.] 'To withhold a point until the closing brief would deprive the respondent of his [or her] opportunity to answer it or require the effort and delay of an additional brief by permission.' [Citation.]" (*Sacramento Cable Television v. City of Sacramento* (1991) 234 Cal.App.3d 232, 244.) Petitioners offer no reason for failure to argue this in their opening brief. And while we are not required to supply a reason for petitioners, it appears the subdivision (e) argument was raised in reply because respondent Board first cited section 21177 in their respondent's brief, noting this provision codified the exhaustion doctrine for CEQA. However, on appeal, the appellant—here, petitioners—bears the burden of demonstrating reversible error (see *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; *State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 610), and must do so by arguments raised in the opening brief unless

We conclude petitioners failed to exhaust administrative remedies with respect to their claim that the Board's findings did not comply with CEQA.

## II

### *Mootness of the Notice Claim*

Petitioners also claim the Board "violate[d] its own regulations when it (a) failed to give [them] proper notice of the Order and (b) improperly denied [the] reconsideration petition as 'untimely' even though it was filed within 20 days after the Board belatedly gave [them] required notice and 30 days after the Order's approval date published on the Board's [W]ebsite." With respect to this claim, the writ petition filed with the trial court sought "declaratory relief declaring the Board's purported rejection of [their] reconsideration petition to be unlawful" and "a peremptory writ of mandate directing [the] Board to make a decision on [their] timely reconsideration petition." However, as the trial court correctly noted, "subsequent to the filing of the writ petition, the [Board] reviewed and acted on the reconsideration petition." "No purpose would be served in directing the doing of that which had already been done." (*Muller v. Municipal Court* (1956) 146 Cal.App.2d 231, 232; *Bruce v. Gregory* (1967) 65 Cal.2d 666, 671; see also *Environmental Protection Information Center, Inc. v. State Bd. of Forestry* (1993) 20 Cal.App.4th 27, 32 ["[m]andamus does not lie to compel that which is being done voluntarily"].)

Nevertheless, petitioners argue the claim is not moot because the Board's "misconduct implicates the public interest, is capable of repetition, and is likely to evade review." We disagree. The Board fully acknowledges it is required to provide prompt

there is good reason for delaying an argument until reply (see *Sacramento Cable Television v. City of Sacramento, supra*, 234 Cal.App.3d at p. 244). Petitioners' apparent failure to discover section 21177, and its subdivision (e) exception, until that section was cited by respondent Board is not good reason.

notice of its water quality certification orders to all interested parties (Cal. Code Regs., tit. 23, § 3859, subd. (a)), it failed to do so in this case, and it erroneously rejected petitioners' reconsideration petition as untimely. Thus, there is no issue to resolve, let alone one that is "of substantial and continuing public interest that may otherwise evade review." (*California Correctional Peace Officers Assn. v. State of California* (2000) 82 Cal.App.4th 294, 303-304; see also *Californians for Alternatives to Toxics v. California Dept. of Pesticide Regulation* (2006) 136 Cal.App.4th 1049, 1069.) Petitioners also argue "a material issue as to the conduct's lawfulness remains for court determination," i.e., whether they are in fact interested parties entitled to notice of the Order. Not so. While SDG&E's answer to the writ petition denied petitioners' status as interested parties, in SDG&E's briefing before the trial court, the company effectively adopted the Board's argument regarding the notice issue, which expressly concedes the Board made a "mistake regarding mailing notice of the Certification Order to petitioners *as interested parties*." (Italics added.) There is no dispute regarding petitioners' status as interested parties entitled to notice of the Order.

Finally, for the first time in their reply brief, petitioners assert the notice claim is not moot because the Board lost jurisdiction to decide the petition for reconsideration after initially rejecting the petition as untimely and filing the notice of determination. We reject this argument for two reasons. First, as already explained, " 'points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before. . . .' " (*Sacramento Cable Television v. City of Sacramento, supra*, 234 Cal.App.3d at p. 244.) While petitioners argued in their opening brief that *they were not required to exhaust administrative remedies* because the Board lost jurisdiction to reconsider the challenged Order after rejecting the petition for reconsideration and filing the notice of determination, they offer no reason for failing to

34

argue the claimed loss of jurisdiction also *prevented the notice claim from becoming moot*.

Second, petitioners fail to demonstrate they were harmed by the Board's admitted error in failing to provide timely notice of the challenged Order, which led to the Board's erroneous rejection of the reconsideration petition as untimely. Petitioners argue, "the Board prejudiced [petitioners] by forcing them to complete their reconsideration petition in *ten fewer days* than the thirty days required by law," thereby depriving petitioners of "sufficient time to identify and present all of the issues in their petition." This 10-day period comes from the fact petitioners were not informed the Order was posted on the Board's Website until November 30, 2010, and the Board's Website listed November 18, 2010, as the date the Order was issued, causing petitioners to believe they had until December 20, 2010, to submit the reconsideration petition. Petitioners do not persuade us that had they had an extra 10 days to prepare the reconsideration petition, they would have raised the findings issue. Indeed, as previously explained, when the Board did accept the reconsideration petition—over three months later—petitioners still did not raise the findings issue. Thus, the record provides us with no basis to conclude petitioners "would have more fully identified the deficiencies in the Board's Order, including its CEQA findings," and, "in turn, the trial court would have had no grounds on which to dismiss [their] findings claim for failure to exhaust."

We conclude the trial court properly dismissed the notice claim as moot. Nor were petitioners prejudiced by the Board's admitted mistake in not providing timely notice of the challenged Order and initial rejection of the reconsideration petition as untimely.

35

DISPOSITION

The judgment is affirmed.  The State Water Resources Control Board and San Diego Gas & Electric Company are entitled to costs on appeal.  (Cal. Rules of Court, rule 8.278.)


                                               HOCH          , J.



We concur:



      BUTZ      , Acting P. J.



      MURRAY    , J.

36